## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

NORMAN GRIM,

       Petitioner,

v.                                  Case No.: 3:08cv2/MCR

EDWIN G. BUSS, Secretary,
Florida Department of Corrections,[1]
et. al,

       Respondents.
_____/

### ORDER ON PETITION FOR WRIT OF HABEAS CORPUS

THIS CAUSE is before the court on a petition for a writ of habeas corpus filed by Norman Grim, a Florida death row inmate, pursuant to Title 28, United States Code, Section 2254 (doc. 1). Petitioner has asserted nine claims for relief. Respondents have filed an answer (doc. 9), and Petitioner has filed a reply (doc. 12). After careful consideration of the issues raised in the pleadings and for the reasons stated below, the petition is denied.

### I.  FACTS & PROCEDURAL HISTORY

The relevant facts are set out as follows in the Florida Supreme Court's opinion affirming Petitioner's conviction and sentence on direct appeal:

> On July 27, 1998, at approximately 5:08 a.m., Deputy Sheriff Timothy Lynch responded to a call from Cynthia Campbell, who complained of a disturbance behind her house. Upon Lynch's arrival, Campbell was standing on her front porch with her next-door neighbor Norman Grim, Jr., who was wearing a pair of cut-off jean shorts. All three walked

---

[1] Edwin G. Buss is successor to Walter A. McNeil who succeeded James R. McDonough as Secretary for the Department of Corrections and is automatically substituted as a party. Former Secretary McNeil was not substituted for Mr. McDonough in this case because no orders were entered during his tenure in office. *See* Fed. R. Civ. P. 25(d)(1).

around the porch to the back of Campbell's house where Lynch noticed a broken window and a chrome lug nut in the surrounding bushes. Before returning to his house, Grim invited Campbell over for a cup of coffee after Lynch finished his investigation.

Connie Kelley, Campbell's bookkeeper, arrived at Campbell's house at 7:20 a.m., entered the house, called Campbell's name, but did not receive an answer. Kelley became concerned and called the police. Cynthia Magee, Campbell's paralegal, went to Campbell's house later in the morning, saw her car parked in front of the house, and went inside to check. Deputy Sheriffs Calvin Rutherford and Steven McCauley arrived ten to fifteen minutes after Magee.

Rutherford obtained permission from Grim to look inside his home and noted that Grim had no shirt on and that there was a light pink color on one of his shoulders.FN1 Neither deputy saw any signs that there had been a struggle in the house.

    **FN1. Deputy McCauley testified that it was blood.**

Corporal Blevin Davis arrived at 11 a.m. and talked briefly with Grim. Davis observed that Grim was wearing a pair of cut-off blue jean shorts with several small reddish brown stains on them; there was another reddish-brown stain on his shoulder. Grim explained that the stains were primer paint from where he had been working on his car. Grim asked for and obtained permission to get his dogs that were now loose in the neighborhood.

Thomas Rodgers, the manager of the north end of the Pensacola Bay fishing bridge, ran a bait and tackle shop and convenience store at the foot of the fishing bridge, and he testified that sometime early in the afternoon of July 27, 1998, Grim came into his store. On the same day, Cynthia Wells, a former coworker of Grim, left work around 1 p.m. and was traveling on the Pensacola Bay bridge where she saw Grim walking beside his parked car with both doors and the trunk open. She testified that he was wearing a light-colored shirt and cut-off blue jean shorts.

In the afternoon of July 27, James Andrews and his son were fishing from the Pensacola Bay bridge. Around 3:30 p.m., Andrews hooked a human body that was wrapped in a sheet, a shower curtain, and masking tape. Law enforcement was called to retrieve the body, which

the parties stipulated was Cynthia Campbell. After receiving word that Campbell's body had been found, Detective Donnie Wiggen went to the convenience store where he talked to Rodgers and retrieved a surveillance videotape showing that Grim had entered the store just after 2 p.m.

Law enforcement officers secured Grim's house. Davis drove to the Pensacola Bay fishing bridge and was present when Campbell's body was brought to shore. Davis testified that her body was wrapped in striped sheets, which the police determined belonged to Grim, and black garbage bags. When the bags and sheets were removed at the autopsy, Davis observed that a piece of green carpet was "wrapped up with everything else." Davis recalled having seen a similar piece of green carpet hanging over the rail of Grim's back porch. Thereafter, the police obtained a search warrant for Grim's home and an arrest warrant.

Crime scene analyst Janice Johnson from the Florida Department of Law Enforcement attended Campbell's autopsy conducted by Dr. Michael Berkland, a forensic pathologist. Johnson testified that under the black garbage bags, the body was wrapped in carpet and sheets. They had to remove "layers of material," including the garbage bags, a floral sheet, a blue striped flat sheet and fitted sheet, a piece of green carpet, masking tape, and rope.

Dr. Berkland testified that Campbell's face was covered with deep abrasions and contusions around both eyes, her forehead, both sides of her chin, and her lips, all of which Dr. Berkland described as blunt force trauma. There was additional blunt force trauma to both shoulders and to the head. These injuries were all consistent with having been inflicted by a hammer. Dr. Berkland testified that Campbell suffered eleven stab wounds to the chest, seven of which penetrated her heart, and were consistent with having been caused by a single-edged weapon like a knife. Dr. Berkland opined that the blows to the head preceded the stabbings to the chest and that Campbell's death was caused by blunt force trauma to the head and multiple stab wounds to the chest.

After attending the autopsy, Janice Johnson went to the victim's home where she found no signs of any struggle. She then went to Grim's home where she found two damp mops in the kitchen that had suspected blood stains. Although the area appeared to have been

cleaned, Johnson discovered small areas of blood on the floor of the kitchen and on the cabinets near the floor. Johnson collected a coffee mug from the kitchen counter and two bloody fingerprints on a trash bag box. Inside the kitchen trash can was a striped pillow case that appeared to have blood on it and that had the same pattern as one of the sheets found wrapped around Campbell's body. In the dining room, Johnson collected additional samples of suspected blood from the window frame and from the floor. In the living room, Johnson seized a pair of athletic shoes and a rope which appeared to be consistent with the rope found on the victim's body. Johnson also collected a pair of blue-jean shorts with bloodstains on them.

On the back porch, Johnson found a piece of green carpet draped over the rail which was consistent with the green carpet wrapped around the victim's body. Johnson also found a cooler in which she found a steak knife, a piece of terry cloth with reddish-brown stains on it, a pair of Hanes underwear, a tampon with reddish-brown stains on it, a pair of prescription eyeglasses, a wristwatch with a broken band, masking tape, a blue and white striped pillowcase, a hammer with suspected blood, some cloth tissue, and a Bud Lite beer carton.

Grim was arrested in Oklahoma on July 31, 1998. Detective Davis flew to Oklahoma to pick him up, to retrieve the clothes he had been wearing, and to arrange for the return of Grim's car.

The prescription glasses found in the cooler matched Campbell's prescription records, and the roll of masking tape in the cooler was fracture-matched to the tape found on Campbell's body. The rope and the green carpet found on Campbell's body were compared to the rope and green carpet found at Grim's home. Although the examiner was unable to fracture-match these pieces, he determined that they were identical in appearance, construction, and fiber type and could have originated from the same source. Fingerprints on the coffee cup found on Grim's kitchen counter were identified as Cynthia Campbell's, and the bloody fingerprints on the trash bag box were identified as Grim's.

DNA analysis of stains on the cut-off jean shorts Grim was wearing when arrested revealed twelve genetic markers consistent with the DNA of Cynthia Campbell, and the steak knife found in Grim's cooler yielded six genetic markers consistent with the victim. The hammer found in the same cooler also yielded genetic markers consistent with the victim, as did swabbings from the box of trash bags. Likewise, stains

on a pair of blue-jean shorts and a pair of shoes found in Grim's living room bore genetic markers consistent with those of the victim.

After the presentation of evidence during the guilt phase, the jury returned a verdict of guilty on the charges of first-degree murder and sexual battery upon a person twelve years of age or older with the use of a deadly weapon. In light of the fact that Grim continued to insist on waiving his right to present mitigating evidence during the penalty phase, and, in fact, ordered his attorneys not to present any mitigation, the trial court conducted a hearing pursuant to *Koon v. Dugger*, 619 So.2d 246 (Fla.1993).FN2 During the hearing, the trial judge determined that Grim freely, voluntarily, and knowingly entered into his decision to waive mitigation and announced that he would conduct the penalty phase before the jury where Grim still could, if he wished, present mitigating evidence. Afterward, the judge stated that he would conduct a *Spencer* hearing FN3 and order a presentence investigation report and, if necessary, he would also appoint an independent or special counsel to present mitigating evidence to the court outside the presence of the jury.

> FN2. This hearing was a continuation of the *Koon* hearing conducted before the jury was chosen.

> FN3. *See Spencer v. State*, 615 So.2d 688 (Fla.1993).

At the penalty phase, the State introduced certified copies and testimony relative to Grim's prior Florida convictions: (1) unarmed robbery; (2) kidnapping and robbery; (3) armed burglary and aggravated battery; and (4) armed burglary and armed theft. The State's last witness was the victim's mother, Dorothea Campbell, who read a short victim impact statement. Grim did not present any mitigating evidence, and the jury recommended the death penalty by a vote of twelve to zero.

At the sentencing hearing, Grim's attorneys were present before the court, along with Spiro Kypreos, special counsel appointed by the trial court to investigate and present mitigation. Grim insisted on not presenting any mitigation and so instructed his attorneys. Defense counsel confirmed Grim's waiver of mitigation, and the trial court found that Grim, against the advice of his counsel, freely and voluntarily decided not to present mitigating evidence.

During sentencing, the State presented its sentencing memorandum to the court, along with depositions from the following persons: Grim's mother, stepfather, and sister, a coworker, a supervisor, and psychologist Dr. James Larson. Defense counsel objected to the attachment of Dr. Larson's deposition because it provided mitigation that Grim did not want presented.

Before there was any presentation of mitigating evidence at the sentencing hearing, defense counsel objected to special counsel Kypreos's presentation, particularly to Dr. Larson's interview with Grim. The trial court denied the objection. Thereafter Kypreos offered in mitigation a presentence report and a psychological report from court proceedings occurring in 1982, a 1983 letter from Grim's public defender in those cases, and a written description of intermittent explosive disorder taken from the Diagnostic and Statistical Manual of Mental Disorders (4th ed.2000). Kypreos also presented testimony from Grim's sister relative to his family life and childhood and two of Grim's work supervisors regarding his work ethic.

*Grim v. State*, 841 So.2d 455, 457-60 (Fla. 2003)(per curiam)(*Grim I*), cert. denied, *Grim v. Florida*, 540 U.S. 892, 124 S. Ct. 230, 157 L. Ed. 2d 166 (2003). A jury found Petitioner guilty on all charges and recommended a sentence of death for the murder of Cynthia Campbell by a vote of twelve to zero. The trial court found three aggravating circumstances beyond a reasonable doubt: (1) the murder was committed by a person under sentence of imprisonment; (2) the defendant had prior convictions for violent felonies; and (3) the murder was committed while the defendant was engaged in the commission of a sexual battery. The trial court found the following statutory mitigating circumstances pursuant to section 921.141(6)(h), Florida Statutes (1997):(1) disruptive home life and child abuse (given significant weight); (2) hard-working employee (given significant weight); and (3) mental health problems that did not reach the level of section 921.141(6)(b) (given great weight). *Grim I*, 841 So.2d at 460. The trial court also considered seventeen nonstatutory mitigators. Because many were subsumed within the statutory mitigation and thus already considered, the trial court considered the following remaining nonstatutory mitigators: (1) lack of long-term psychiatric care (no weight); (2) marital problems

and situational stresses (great weight); (3) errors of judgment under stress (no additional weight); (4) model prison inmate (some weight); and (5) entered prison at a young age (given little weight). *Id*. The trial court ordered and adjudicated Petitioner guilty of first-degree murder and sentenced him to death. The court also found Petitioner guilty of sexual battery upon a person twelve years of age or older with the use of a deadly weapon and sentenced him to 390.5 months in state prison to run consecutively to the death sentence. *Id*.

Petitioner appealed his conviction and sentence raising three issues on direct appeal.[2] The Florida Supreme Court found no error and affirmed Petitioner's conviction and sentence of death. *See Grim I*. Petitioner thereafter filed a motion for postconviction relief under Fla. Rule of Criminal Procedure 3.850, raising numerous claims.[3] After an evidentiary hearing, the postconviction court denied

---

[2] Petitioner raised the following issues on direct appeal: (1)(a) the trial court erred by giving great weight to the jury's recommendation; (1)(b) the trial court should have required special counsel to present mitigation evidence to the penalty-phase jury; (2) the trial court abused its discretion in failing to call Dr. Larson (mental health expert) as its own witness; and (3) the trial court abused its discretion and violated Petitioner's due process rights when it refused to allow him to present the victim's hearsay statements. *See Grim v. State*, 841 So.2d 455 (Fla. 2003)(*Grim I*).

[3] Petitioner raised the following issues in his postconviction motion for relief: (1) violations of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972), related to (a) failure to disclose information related to the suspension of Dr. Michael Berkland, a pathologist, from practice in Missouri; (b) failure to disclose knowledge that a neighbor of the victim had committed several burglaries in the area; (c) failure to disclose a letter from Donald Ramsey detailing Petitioner's excessive drug and alcohol use; (d) failure to disclose the entirety of the surveillance tape from the bait shop; and (e) cumulative analysis of the withheld evidence; (2) ineffective assistance of guilt-phase counsel related to (a) failure to move for disqualification of the trial judge; (b) failure to present a voluntary intoxication and poly-use of prescribed drugs defense; (c) failure to use an independent medical examiner; (d) improper comments to the court regarding Petitioner's desire not to argue for lesser included offenses; (e) failure to adequately cross-examine Detective Davis; (f) failure to attack the State's evidence that Petitioner disposed of the victim's body on the Pensacola Bay Bridge; (g) failure to object to admissibility of evidence of blood from Petitioner's bedroom and vehicle; (h) failure to argue cross-contamination of the items in the cooler; (i) failure to argue that law enforcement analysis could not link a tampon found in the cooler to the victim; (j) failure to argue that physical evidence at the scene was not the responsibility of Petitioner; (k) failure to point out that Lynch indicated Campbell was not wearing socks, but she was wearing socks when discovered; (l) failure to point out an indication that there were two sets of tire tracks in Petitioner's backyard; (n) failure to adequately challenge the validity of the search warrant; and (o) failure to present the information underlying the *Brady* claims to the extent it was available to counsel; (3) ineffective assistance of penalty-phase and special counsel related to (a) failure to adequately investigate and present available mitigation, which rendered Petitioner's waiver of mitigation uninformed; (b) failure to advise

relief, and the Florida Supreme Court affirmed this denial.  *See Grim v. State*, 971 So.2d 85  (Fla. 2007)(*Grim II*).

Petitioner filed the instant petition on January 2, 2008.  Doc. 1.  The petition is now ripe for adjudication.

## II.  EVIDENTIARY HEARING

Petitioner requests a plenary evidentiary hearing on the claims presented in his petition.[4]  Doc. 1 at 2.  Title 28 of the United States Code, Section  2254 provides for an evidentiary hearing in federal habeas claims under very limited circumstances:

> **(2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that--**
>
>> **(A) the claim relies on--**
>>> **(i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or**
>>> **(ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and**
>>
>> **(B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.**

28 U.S.C. § 2254(e)(2)(2002).   Under Section 2254(e) a hearing is not warranted "if such a hearing would not assist in the resolution of [the] claim."  *See Breedlove v. Moore*, 279 F.3d 952, 960 (11th Cir. 2002) (citation omitted).  In *Schriro v. Landrigan*,

---

Petitioner of his right to waive a jury advisory sentence; and (c) failure to object to a prejudicial comment from a trial spectator; (4) special counsel had an undisclosed conflict of interest; (5) Florida's capital sentencing scheme is unconstitutional under *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002); and (6) cumulative errors deprived Petitioner of a fundamentally fair trial.  *Grim v. State*, 971 So.2d 85, 91 n.4(Fla. 2007)(*Grim II*).

[4]  Petitioner was granted an evidentiary hearing in state court.

Case No.: 3:08cv2/MCR

550 U.S. 465, 474-75, 127 S. Ct. 1933, 1940, 167 L. Ed. 2d 836 (2007), the Court explained:

> In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief. *See, e.g., Mayes v. Gibson*, 210 F.3d 1284, 1287 (C.A.10 2000). Because the deferential standards prescribed by § 2254 control whether to grant habeas relief, a federal court must take into account those standards in deciding whether an evidentiary hearing is appropriate. *See id.*, at 1287-1288 ("Whether [an applicant's] allegations, if proven, would entitle him to habeas relief is a question governed by [AEDPA]").
>
> * * * *
>
> This principle accords with AEDPA's acknowledged purpose of "reduc[ing] delays in the execution of state and federal criminal sentences." *Woodford v. Garceau*, 538 U.S. 202, 206, 123 S. Ct. 1398, 155 L.Ed.2d 363 (2003) (citing *Williams v. Taylor, supra*, [529 U.S. 362] at 386, 120 S. Ct. 1495 (opinion of STEVENS, J.) ("Congress wished to curb delays, to prevent 'retrials' on federal habeas, and to give effect to state convictions to the extent possible under law")). If district courts were required to allow federal habeas applicants to develop even the most insubstantial factual allegations in evidentiary hearings, district courts would be forced to reopen factual disputes that were conclusively resolved in the state courts.

(footnote omitted). Petitioner has not presented or proffered any evidence to this court which would necessitate an evidentiary hearing on any of the claims he has raised. See *Ojeda v. Sec.'y for Dep't. of Corrs.,* 279 Fed. Appx. 953, 954 n.1 (11th Cir. 2008)(per curiam)(evidentiary hearing is unnecessary where trial transcripts sufficiently address an issue, and a hearing would not have added any new information). See also *Kelley v. Sec.'y for Dep't of Corrs.*, 377 F.3d 1317, 1334-37 (11th Cir. 2004)(capital petitioner met none of the requirements contained in 28 U.S.C. § 2254(e)(2); thus district court abused discretion in granting evidentiary hearing). Because Petitioner has not met the requirements for an evidentiary hearing pursuant to 28 U.S.C. § 2254(e)(2), his request for an evidentiary hearing will be denied.

## III.  STANDARD OF REVIEW

Section 2254(a) of Title 28 provides that "a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" upon a showing that his custody is in violation of the Constitution or laws of the United States.  As the instant petition was filed after April 24, 1996, it is subject to the more deferential standard for habeas review of state court decisions under § 2254 as brought about by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").  Pub.L. 104-132, § 104, 110 Stat. 1214, 1218-19. In relevant part, section 2254(d) now provides:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254 (2002).

The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000).[5]  The appropriate test was described by Justice O'Connor as follows:

> In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied—the state court adjudication resulted in a

---

[5]  Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

decision that (1) "was contrary to . . . clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring); *Ramdass v. Angelone*, 530 U.S. 156, 120 S. Ct. 2113, 2119–20, 147 L. Ed. 2d 125 (2000). The Supreme Court has instructed that on any issue raised in a federal habeas petition upon which there has been an adjudication on the merits in a formal state court proceeding, the federal court should first ascertain the "clearly established Federal law," namely, "the governing legal principle or principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). The law is "clearly established" if Supreme Court precedent at the time "would have compelled a particular result in the case." *Neelley v. Nagle*, 138 F.3d 917, 923 (11th Cir. 1998), *overruled on other grounds* by *Parker v. Head*, 244 F.3d 813, 835 (11th Cir. 2001).

Next, the court must determine whether the state court adjudication is contrary to the clearly established Supreme Court case law, either because "'the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases' or because 'the state court confronts a set of facts that are materially indistinguishable from a decision of th[e] [Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.'" *Lockyer*, 538 U.S. at 73 (quoting *Williams*, 529 U.S. at 405–06). The Supreme Court has clarified that "[a]voiding these pitfalls does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither

the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8, 123 S. Ct. 362, 365, 154 L. Ed. 2d 263 (2002) (quoting *Williams*, 529 U.S. at 405–06). If the state court decision is found in either respect to be contrary, the district court must independently consider the merits of the petitioner's claim.

If, on the other hand, the state court applied the correct Supreme Court precedent, and the facts of the Supreme Court cases and the petitioner's case are not materially indistinguishable, the court must proceed to the third step and determine whether the state court "unreasonably applied" the governing legal principles set forth in the Supreme Court's cases. The standard for an unreasonable application inquiry is "whether the state court's application of clearly established federal law was objectively unreasonable." *Williams*, 529 U.S. at 409. Whether a state court's decision was an unreasonable application of legal principle must be assessed in light of the record the court had before it. *Holland v. Jackson*, 542 U.S. 649, 652, 124 S. Ct. 2736, 2737–38, 159 L. Ed. 2d 683 (2004) (per curiam); *cf. Bell v. Cone*, 535 U.S. 685, 697 n.4, 122 S. Ct. 1843, 1851 n.4, 152 L. Ed. 2d 914 (2002) (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law). An objectively unreasonable application of federal law occurs when the state court "identifies the correct legal rule from Supreme Court case law but unreasonably applies that rule to the facts of the petitioner's case" or "unreasonably extends, or unreasonably declines to extend, a legal principle from Supreme Court case law to a new context." *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001). The state court's incorrect or erroneous application of clearly established law may be found reasonable, and not warranting a writ, so long as the state court adjudication results in a "satisfactory conclusion." *Williams*, 529 U.S. at 410–12.

Section 2254(d) also allows federal habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based

on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). The Supreme Court has clarified that: "a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." *Miller-El v. Cockrell*, 537 U.S. 322, 340, 123 S. Ct. 1029, 1041, 154 L. Ed. 2d 931 (2003) (dictum). When performing its review under § 2254(d), the federal court must bear in mind that any "determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner bears "the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see e.g. Miller-El*, 537 U.S. at 340 (explaining that a federal court can disagree with a state court's factual finding and, when guided by AEDPA, "conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence"); *Jones v. Walker*, 496 F.3d 1216, 1226–27 (11th Cir. 2007) (holding that § 2254(d)(2)'s "unreasonable determination" standard "must be met by clear and convincing evidence," and concluding that that standard was satisfied where prisoner showed "clearly and convincingly" that the state court's decision "contain[ed] an 'unreasonable determination' of fact.").

Only if the federal habeas court finds that the petitioner satisfied AEDPA, and § 2254(d), does the court take the final step of conducting an independent review of the merits of the petitioner's claims. *See Panetti v. Quarterman*, 551 U.S. 930, 127 S. Ct. 2842, 2858, 168 L. Ed. 2d 662 (2007); *Jones*, 496 F.3d 1216 (same). The writ will not issue unless the petitioner shows that he is in custody "in violation of the Constitution or laws and treaties of the United States." 28 U.S.C. § 2254(a). Finally, in the event that constitutional error is found in a habeas proceeding, the relevant harmless error standard is set forth in *Brecht v. Abrahamson*, 507 U. S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict.' Under this standard,

habeas petitioners may obtain plenary review of their constitutional claims, but are not entitled to habeas relief based on trial error unless they can establish 'actual prejudice.'" *Id.* at 637 (quoting *Kotteakos v. United States*, 328 U. S. 750, 776, 66 S. Ct. 1239, 1253, 90 L. Ed. 1557 (1946)).[6]

Within this framework, the court will review Petitioner's claims.

## IV.    PETITIONER'S CLAIMS

### Ground I:   Trial Court Erred in Not Admitting Victim's Statements

Petitioner alleges the trial court erred in not admitting hearsay statements made by Ms. Campbell that threats had been made against her life by representatives of Henry Company Homes, Inc., a party she was litigating against at the time of her death. Petitioner alleges that these statements were reliable and his defense was thwarted by the exclusion of these statements at trial in violation of his Eighth and Fourteenth Amendment due process rights Doc. 1 at 40-47.

### 1.    State Court Proceedings

Petitioner raised this issue in the direct appeal of his conviction and sentence. The Florida Supreme Court denied relief, holding as follows:

> In his third issue on appeal, Grim asserts that the trial court abused its discretion and violated his due process rights when it refused to allow him to present his only defense-the victim's hearsay statements to Jan Wallace and Charles Worrel demonstrating that someone else could have killed Cynthia Campbell. We disagree.
>
> Before trial, defense counsel filed a notice of intent to introduce victim hearsay statements and a supporting memorandum of law. The trial court denied the motion by written order and found the proffer insufficient to establish that the victim's statements to Wallace qualified as an excited utterance. The court also found no other hearsay exception applicable and noted that threats to the victim by a third person were inadmissible in the absence of other evidence tending to connect such person to the crime.

---

[6]  This harmless error standard is also applicable to cases involving habeas challenges to death sentences. *See Calderon v. Coleman*, 525 U.S. 141, 119 S. Ct. 500, 142 L. Ed. 2d 521 (1998); *Duest v. Singletary*, 997 F.2d 1336 (11th Cir. 1993); *Hicks v. Head*, 333 F.3d 1280 (11th Cir. 2003).

Case No.: 3:08cv2/MCR

Wallace's proffered testimony demonstrated that she was employed by the victim as her paralegal for a week and a half in the early summer of 1998. Sometime during that week, the victim Campbell was supposed to have met with representatives from Henry Company Homes. Upon her return from this meeting, Campbell appeared upset and told Wallace that one of the people she was supposed to meet had not shown up and that she had been forced to crawl into the attic to inspect a crack and had gotten sweaty, hot, and dirty. Campbell also reported to Wallace that the person who was in the attic with her told her she was "putting her nose where it didn't belong, and she was going to find herself dead in the bay if she continued." Campbell then told Wallace, "If I ever end up dead in the bay, point your finger at Henry Homes." Wallace testified that Campbell did not appear to be upset by the threat and laughed it off. Wallace was not sure how much time had elapsed between the threat and the victim's statements to her and that she was not sure of the identity of the person who was present at the meeting, or whether that person was an employee or representative of Henry Company Homes. The trial court adhered to its previous ruling and denied the admissibility of the hearsay statements.

Before the State rested in the guilt phase, defense counsel proffered the testimony of Charles Worrell who stated that Campbell represented him in litigation against Henry Company Homes. Worrell testified that Campbell told him that threats had been made against her life as the result of her litigation against Henry Company Homes, that he had not heard any threats personally, and that Campbell did not identify by name anyone who had been threatening her. The trial court denied the admission of Campbell's hearsay statements to Worrell.

Even though the trial court did not allow the testimony of Wallace or Worrell, it permitted defense counsel to cross-examine Corporal Davis before the guilt phase jury relative to his investigation of information that Henry Company Homes had threatened the victim. Defense counsel asked Davis if he recalled a report indicating that Henry Company Homes might have been responsible for Cynthia Campbell's death. Davis answered affirmatively and testified that Detective Wiggen, who investigated the report, found no merit to the report. Davis testified that he did not personally conduct the investigation and had no further knowledge of it.

Appellate defense counsel conceded at oral argument and we agree that the proffered testimony of Wallace and Worrell was insufficient to

establish the prerequisites for admitting the victim's statements as an excited utterance,FN7 a spontaneous statement FN8 or as a statement relating to the declarant's state of mind.FN9 *See Stoll v. State*, 762 So.2d 870 (Fla. 2000). No other justification appears for admitting this testimony. Defense counsel presented nothing other than hearsay reports that the victim had been threatened by representatives or employees from Henry Company Homes, Inc. There was no identification of the person or persons who made these threats, and no other evidence that implicated Henry Company Homes, Inc., or otherwise connected the company to Campbell's murder.

> FN7. An excited utterance is "[a] statement or excited utterance relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." § 90.803(2), Fla. Stat. (1999).

> FN8. A spontaneous statement is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter, except when such statement is made under circumstances that indicate its lack of trustworthiness." § 90.803(1), Fla. Stat. (1999).

> FN9. Section 90.803(3), Florida Statutes (1999), provides for admission of testimony as to the following matters:

> (3) Then-existing mental, emotional, or physical condition.-

> (a) A statement of the declarant's then-existing state of mind, emotion, or physical sensation, including a statement of intent, plan, motive, design, mental feeling, pain, or bodily health, when such evidence is offered to:
> 1. Prove the declarant's state of mind, emotion, or physical sensation at that time or at any other time when such state is an issue in the action.
> 2. Prove or explain acts of subsequent conduct of the declarant.

> (b) However, this subsection does not make admissible:
> 1. An after-the-fact statement of memory or belief to prove the fact remembered or believed, unless such statement

> relates to the execution, revocation, identification, or
> terms of the declarant's will.
> 2. A statement made under circumstances that indicate its
> lack of trustworthiness.
>
> We reject Grim's contention that the hearsay testimony was reliable and
> thus should have been admitted for the purpose of establishing that
> someone other than Grim committed the murder. Grim's claim relies
> upon *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d
> 297 (1973); however, he fails to recognize that in *Chambers*, the court
> held that the hearsay statements of a third person who orally confessed
> to the murder should have been admitted because the statements'
> reliability was clearly established. *Id.* at 300-01, 93 S. Ct. 1038; *see also*
> *Sliney v. State*, 699 So.2d 662 (Fla.1997); *Lightbourne v. State*, 644
> So.2d 54 (Fla.1994). The same cannot be said for the hearsay
> statements at issue. Moreover, the trial court did, in fact, allow the
> defense to present evidence through Detective Davis's
> cross-examination that someone else could have possibly killed
> Campbell. We therefore conclude that the trial court did not abuse its
> discretion or violate Grim's due process rights when it denied the
> admission of the hearsay statements.

*Grim I*, 841 So.2d at 462-64.

    2.    **Clearly Established Supreme Court Law**

State lawmakers have broad latitude under the Constitution to establish rules

excluding evidence from criminal trials. *See United States v. Scheffer*, 523 U.S. 303,

308, 118 S. Ct. 1261, 140 L. Ed. 2d 413 (1998)(exclusion of polygraph examination

results offered by an accused to support his credibility does not violate Sixth

Amendment right to present a defense); *Crane v. Kentucky*, 476 U.S. 683, 689-690,

106 S. Ct. 2142, 90 L. Ed.2d 636 (1986) (permitting exclusion of evidence that "poses

an undue risk of 'harassment, prejudice, [or] confusion of the issues' " (quoting

*Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986));

*See also Marshall v. Lonberger*, 459 U.S. 422, 438, n. 6, 103 S. Ct. 843, 74 L. Ed. 2d

646 (1983); *Spencer v. Texas*, 385 U.S. 554, 564, 87 S. Ct. 648, 17 L. Ed. 2d 606 (1967).

This latitude does have its limitations, particularly when a defendant's opportunity

to present a meaningful defense is abridged by evidence rules that "infring[e] upon

a weighty interest of the accused" and are " 'arbitrary' or 'disproportionate to the purposes *they are designed to serve.' " Scheffer, supra, 523 U.S. at 308 (quoting Rock v. Arkansas*, 483 U.S. 44, 58, 56, 107 S. Ct. 2704, 97 L. Ed. 2d 37 (1987)).

In *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), the Supreme Court held that due process requirements can supersede application of state hearsay rules, and that where testimony contains sufficient indicia of reliability and directly affects the ascertainment of guilt or innocence, the strict application of the hearsay rule cannot be employed to disallow the evidence. In *Chambers*, petitioner Leon Chambers wanted to present evidence that a third party, Gable McDonald, had committed the crime in question. *Id*. at 292. As part of this effort, Chambers attempted to present testimony of three witnesses to whom McDonald had confessed. *Id*. at 292-93. The trial court, upholding the state's hearsay objections, refused to allow the testimony. *Id*. at 293. Explaining that "the hearsay rule may not be applied mechanistically to defeat the ends of justice," the Supreme Court determined that the specific "facts and circumstances" of the case warranted admission of the testimony. *Id*. at 302-03. The exclusion of the evidence "coupled with the State's refusal to permit Chambers to cross-examine McDonald [due to Mississippi's "voucher rule"], denied him a trial in accord with traditional and fundamental standards of due process," which include "the right to a fair opportunity to defend against the State's accusations." *Id*. at 294. In deciding that Chambers should have been allowed to introduce the hearsay testimony of the three witnesses, the Court focused on the reliability of the out-of-court statements. The Court highlighted four factors to be considered in assessing reliability: (1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent to which the declaration is really against a declarant's penal interest; and (4) the availability of the declarant as a witness, that is, whether the state could cross-examine him regarding his statements. *Id*. at 300-01.

While arbitrary rules which do not serve a legitimate purpose may be unconstitutional, the Court more recently noted:

> While the Constitution thus prohibits the exclusion of defense evidence under rules that serve no legitimate purpose or that are disproportionate to the ends that they are asserted to promote, well-established rules of evidence permit trial judges to exclude evidence if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury.

*Holmes v. South Carolina,* 547 U.S. 319, 326, 126 S. Ct. 1727, 1732, 165 L. Ed 2d 503 (2006)(exclusion of defense evidence of third-party guilt in capital murder case, on ground that proffered evidence did not raise a reasonable inference as to defendant's own innocence in light of strong forensic evidence of defendant's guilt, denied defendant fair trial; trial court focused on the strength of the prosecution's case, rather than the probative value or the potential adverse effects of admitting the defense evidence of third-party guilt). In *Holmes*, the Court recognized that generally when an accused wishes to introduce evidence tending to show that another person committed the crime for which he is charged, this evidence "may be excluded where it does not sufficiently connect the other person to the crime, as, for example, where the evidence is speculative or remote, or does not tend to prove or disprove a material fact in issue at the defendant's trial." (footnotes omitted)). *Id.* at 327. The Court noted that such rules are widely accepted, and are designed to focus the trial on the central issues by excluding evidence that has only a very weak logical connection to the central issues.

### 3.    Federal Review of Claim

Prior to trial Petitioner's counsel, Richard Hill, filed a Notice of Intent to Introduce Victim Hearsay Statements made by Ms. Campbell to her paralegal, Janet Wallace, and her client, Charles Worrell.  Trial Record ("T.") Vol. 1 at 132.  Petitioner argued that these statements fell within several hearsay exceptions outlined in § 90.803(1), Fla. Stat. (1999), including the spontaneous statement, excited utterance,

and state of mind exceptions.  The trial court disagreed finding that the statements were inadmissible under any of these hearsay exceptions.  Additionally, the trial court ruled that even if the statements were admissible under a hearsay exception, they still would be excluded on the grounds of prejudice or confusion.  The court noted that "[t]he rule is that threats by a third person against a victim may not be shown unless coupled with other evidence having an inherent tendency to connect such other person with the actual commission of the crime."  Order on Defendant's Notice of Intent to Introduce Victim Hearsay Statements, T. Vol. II at 209.[7]

Petitioner's counsel thereafter proffered Ms. Wallace's testimony to the trial court.  Ms. Wallace testified that she was a paralegal/legal secretary and worked for Ms. Campbell for  approximately one week and a half.  T. Vol. III at 467.  She related that Ms. Campbell had returned to her office from a meeting with a housing inspector and a representative from Henry Company Homes and was "upset."  *Id.* Ms. Wallace recounted Ms. Campbell's statements to her as follows:

> She said that she had a meeting with two gentlemen, and I don't know who they were.  One of them didn't show up, so I am not sure which one didn't show up except that she was very agitated that this particular person hadn't shown up.
>
> The one that did show up went up; she went up in the attic of this house that she had–there was a crack in the ceiling.  I'm sure she went up in the attic of this house, and she went further into the attic and inspected or did some of his job and was, basically, trying to tell him what to do.
>
> And he told her if she didn't stop doing that she was going to–she was putting her nose where it didn't belong, and she was going to find herself dead in the Bay if she continued to put her nose where it didn't belong.
>
> * * *

---

[7]  The trial court also ruled that Petitioner had failed to proffer a sufficient factual basis for the admissibility of Mr. Worrell's statements, so the court did not render an opinion on the admissibility of these statements.

> She said, "If that happens to me," she said, "If I ever end up dead in the
> Bay, point your finger at Henry Company Homes."

*Id*. at 468-69.  When asked if Ms. Campbell appeared upset about what had been said

to her, Ms. Wallace responded, "Not really.  She took it, like, par for the course.  She

was used to that kind of treatment from them or something; it was just sort of my

impression, you know.  But she had a sort of strange sense of humor.  She kind of

laughed it off."  *Id*. at 470.  When the trial court asked her if Ms. Campbell was

agitated out of frustration or out of fear, Ms. Wallace responded, "She didn't seem

fearful to me as much as she seemed agitated and just put out but, you know, she–I

don't think she feared a lot, anyway.  She was a pretty brave woman."  *Id*. at 471.  On

cross-examination, Ms. Wallace was not sure but felt that a couple of hours elapsed

between Ms. Campbell's meeting and her relating what happened to Ms. Wallace.

*Id*. at 473.   When asked again why Ms. Campbell seemed upset, Ms. Wallace

testified:

> She was upset because whoever didn't show up, and she was upset
> because she had to go up in the attic, and she was upset that it took so
> much longer than she thought it should.  And she was fussing that they
> were, once again, not doing what they were supposed to be doing and
> letting people down.
>
> And she was fussing about the crack and the fact that she had to go in,
> and he tried to stop her from finding things and problems that was
> wrong in the attic that, you know–that she was going beyond what she
> should have been doing–is what he told her.
>
> She did a lot of fussing and talking, but I really didn't know about what
> she was talking about because I didn't know what she was talking
> about.

*Id*. at 475.  After the proffer, the trial court again ruled that Ms. Wallace's testimony

would be excluded for the reasons set forth in its written order.  *Id*. at 481, 483.

After the State rested, Petitioner's counsel proffered the testimony of Charles

Worrell, who was a client of Ms. Campbell's for approximately a year in a case Ms.

Cambell was working up for him against Henry Company Homes.  T. Vol. IV at 686.

Mr. Worrell testified that "[Ms. Campbell] was basically implying people affiliated with Henry Company Homes, Incorporated" were making threats against her life. *Id.* at 687. Mr. Worrell stated that Ms. Campbell did not specify who made these threats against her but it was over the course of her litigation with the company. After this proffer, the trial court ruled that it was excluding Mr. Worrell's testimony for the same reasons it was excluding Ms. Wallace's testimony, namely:

> I don't see anything that couples those alleged threats and the motive with any other evidence tending to directly connect Henry Homes, or an employee, or person associated with Henry Homes with the actual commission of the crime. And it's that connection that is the basis of the Court not allowing it, because I don't have any evidence before me other than the allegation of a threat and possible motive. I don't have anything more than that that would actually connect them with the actual commission of the crime.

*Id.* at 699-700. The defense then called lead investigator Blevin Davis to the stand for the limited purpose of determining whether the Sheriff's Office investigated the statements pertaining to Henry Company Homes made by Ms. Campbell. Mr. Davis testified before the jury, "[t]hat was looked into by another detective. He investigated it, determined to be nothing to it; and that was the end of it." *Id.* at 702.

The Florida Supreme Court held that defense counsel presented nothing more than hearsay reports that the victim had been threatened by representatives or employees of Henry Company Homes, Inc., that these person were not identified and there was no other evidence presented which implicated the company or otherwise connected the company to Ms. Campbell's murder. Additionally, the Florida Supreme Court found that Petitioner had not presented evidence sufficient to fall within the prerequisites of exceptions to the State's hearsay rules. The court also noted that Petitioner "fails to recognize that in *Chambers*, the court held that the hearsay statements of a third person who orally confessed to the murder should have been admitted because the statements' reliability was clearly established." *Grim I*, 841 So.2d at 464. In Petitioner's case the state court found that the reliability of the statements at issue was not clearly established.

Petitioner has failed to establish a sufficient nexus between the purported threats by some unidentified person or persons associated with Henry Company Homes and the crime for which Petitioner was charged.  Unlike the archaic "voucher rule" at issue in *Chambers*,[8] the trial court in this case applied portions of Florida's hearsay rule[9] which have never been held unconstitutional by the Supreme Court. Furthermore, Petitioner has not demonstrated that this evidentiary rule was applied in an arbitrary fashion in his case.  The state court determined that the statements were not sufficiently reliable to justify introduction at trial.  The Eleventh Circuit Court of Appeals has noted that:

> The decision of whether the exclusion of testimony amounts to a denial of fundamental fairness violative of the due process clause requires a balancing of interests: 'The defendant certainly has a strong interest in presenting exculpatory evidence, but the state has an interest in promoting reliable trials, particularly in preventing the injection of collateral issues into the trial through unsupported speculation about the guilt of another party. Due process may require a trial court to allow the introduction of evidence of another party's possible guilt when there is some showing of a nexus between the other party and the particular crime with which a defendant is charged.'

*Card v. Dugger* 911 F.2d 1494, 1514 -1515 (11th Cir. 1990)(quoting *Cikora v. Dugger*, 840 F.2d 893, 898 (11th Cir.1988) (footnote omitted)).  In this case, Petitioner has not shown that  due process required the presentation of this hearsay evidence; he has not presented sufficiently reliable evidence to overcome the state's interest in

---

[8]  The Supreme Court in *Chambers v. Mississippi* , 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), held the state's "voucher rule," a Mississippi common-law rule that a party may not impeach his own witness, was unconstitutional because the arbitrary manner in which it barred parties from impeaching their own witnesses. *Id.*, 410 U.S. at 294. The Court also noted that the state hearsay rule did not include an exception for statements against penal interest, so the defendant was not permitted to introduce evidence that his witness had made self-incriminating statements to other persons, thus denying him a fair trial. *Id.* at 297.

[9]  "In general, the exceptions to the exclusionary rule proceed upon a theory that under appropriate circumstances a hearsay statement may possess circumstantial guarantees of trustworthiness sufficient to justify introduction of the evidence at the trial even though the declarant may be available." Section 90.803, Fla. Stat., The Florida Bar Code and Rules of Evidence Committee Comment, 1988 Amendment.

promoting a reliable trial by his proffer of unsupported speculation that another party may be guilty of the crime.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in a manner which was objectively unreasonable in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground II:     *Brady v. Maryland* Claim/ Ineffective Assistance of Counsel

Petitioner alleges in his second claim that the State failed to turn over to the defense information in its possession that Dr. Michael Berkland, the medical examiner in the case, had been suspended from practice in Missouri. Petitioner contends that the failure to disclose this information constitutes a violation under *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963), and was prejudicial to him because Dr. Berkland's testimony that a sexual battery occurred on the victim was the only evidence that supported a first-degree murder conviction. *See* doc. 1 at 48-60.

1.     State Court Proceedings

Petitioner raised this claim in his postconviction proceeding, and the postconviction court denied relief. The Florida Supreme Court affirmed, holding as follows:

> Dr. Michael Berkland, a medical examiner, performed the autopsy of Cynthia Campbell. At trial, Berkland testified that Campbell suffered severe blunt force trauma consistent with having been repeatedly bludgeoned with a hammer. Berkland also testified that the victim had been stabbed with a knife no fewer than eleven times and that injuries

to the pelvic area indicated an object had been forcibly inserted into her vagina and removed at a sharp angle. Berkland's testimony about the insertion of an object into the victim's vagina formed the basis for the sexual battery charge of which Grim was convicted. The sexual battery charge in turn formed the basis for the felony-murder prong of Grim's first-degree murder indictment.

At the time of Grim's trial, Berkland's license to perform autopsies in Missouri had been revoked.FN5 The State Attorney's Office had received a twenty-three page facsimile communication dated October 12, 1998, containing various newspaper articles, court papers, and letters documenting the revocation of Berkland's license. These documents were never turned over to the defense. On March 25, 1999, Berkland gave a sworn deposition attended by Assistant State Attorney Ronald Swanson and Assistant Public Defender Antoinette Stitt. Berkland admitted that his Missouri autopsy license had been revoked and explained the circumstances surrounding its revocation.

> FN5. Despite the revocation of his license in Missouri, at the time of trial Berkland was licensed to perform autopsies in Florida.

After the Public Defender withdrew from Grim's case due to a conflict, Richard Hill replaced Ms. Stitt as defense counsel. Hill testified that the Public Defender's Office provided him all its files and deposition records and that he reviewed Berkland's March 1999 deposition testimony. However, Hill never impeached Berkland about the revocation of his Missouri license. Grim argues that the State's failure to disclose the faxed documents constitutes a *Brady* violation. He also argues that Hill's failure to impeach Berkland at trial constitutes ineffective assistance of counsel. The merits of these claims are analyzed below.

### a. The *Brady* Claim

As we recently explained,

> *Brady* requires the State to disclose material information within its possession or control that is favorable to the defense. To establish a *Brady* violation, the defendant has the burden to show (1) that favorable evidence-either exculpatory or impeaching, (2) was willfully or

inadvertently suppressed by the State, and (3) because the evidence was material, the defendant was prejudiced.

To establish prejudice or materiality under *Brady*, a defendant must demonstrate "a reasonable probability that the jury verdict would have been different had the suppressed information been used at trial. In other words, the question is whether 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.'"

*Riechmann v. State*, 966 So.2d 298, 307 (Fla. 2007) (citations omitted) (quoting *Ponticelli v. State*, 941 So.2d 1073, 1084-85 (Fla.2006)).

The documents the State failed to disclose call into question Berkland's qualifications as a medical examiner. They include a permanent injunction issued in Jackson County, Missouri, which states that Berkland "poses a substantial probability of serious danger to the health, safety, and welfare of his patients, clients, and/or the residents of Missouri." A newspaper article, "Skill of Medical Examiner Debated," describes the disciplinary charges against Berkland; and a letter from the Missouri Board of the Healing Arts states that "we have discovered evidence that one of the former medical examiners from Jackson County, Missouri, a physician currently licensed in the State of Missouri, fabricated autopsy findings while performing his duties." These and other similar documents undoubtedly represent favorable impeachment evidence that could have been utilized by the defense. Therefore, they satisfy the first *Brady* prong. In addition, the State concedes that it failed to disclose these materials. Therefore, Grim's claim satisfies the second *Brady* prong.

However, because Grim failed to present any evidence challenging the validity of Berkland's autopsy in this case, Grim fails to establish prejudice. Although defense counsel may have been able to attack Berkland's qualifications based on the information contained in the faxed documents, there is no indication that the substance of Berkland's testimony was erroneous. At the evidentiary hearing, Grim failed to present any evidence that Berkland's testimony or autopsy were defective. Grim did not produce any expert testimony contradicting Berkland's conclusion that the victim had been repeatedly attacked with a hammer, stabbed multiple times, and had an object forcefully inserted into her vagina. Therefore, the State's failure to

disclose the faxed documents does not undermine confidence in the jury's guilty verdict, and the trial court properly denied Grim's *Brady* claim.

*Grim II*, 971 So.2d at 93.

2. Clearly Established Supreme Court Law

a. *Brady v. Maryland*

In *Brady v. Maryland*, *supra*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In *Strickler v. Greene*, the Supreme Court set out the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." 527 U.S. 263, 281- 282, 119 S. Ct. 1936, 1948, 144 L. Ed. 2d 286 (1999). The duty to disclose exculpatory evidence is applicable even in the absence of a request by the defendant. *Id.*, 527 U.S. at 280.

As to the suppression element, the state has an obligation to disclose all exculpatory evidence within its constructive knowledge, including "evidence known to others acting on the government's behalf in the case, including the police." *Kyles v. Whitley*, 514 U.S. 419, 437, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). However, a *Brady* violation does not occur if the defendant possessed the evidence or could have obtained it with any reasonable diligence. *See United States v. Schlei*, 122 F.3d 944, 989 (11th Cir. 1997). Because the jury's evaluation of the truthfulness and the reliability of a witness may be determinative of the defendant's guilt, the disclosure requirement of *Brady* applies with equal force to evidence that affects only the credibility of a witness. *Giglio v. United States*, 405 U.S. 150, 154, 92 S. Ct. 763, 766, 31 L. Ed. 2d 104 (1972)(citation omitted). The Supreme Court expounded on the materiality or prejudice element in *United States v. Bagley*, 473 U.S. 667, 105 S. Ct.

3375, 87 L. Ed. 2d 481 (1985).  The Court explained, "the prosecution is not required to deliver his entire file to defense counsel, but only to disclose evidence favorable to the accused that, if suppressed, would deprive the defendant of a fair trial."  *Id.,* 473 U.S. at 675.  Thus, there is no constitutional violation unless the suppressed evidence "is of sufficient significance to result in the denial of the defendant's right to a fair trial."  *Id.* at 675-76.  The Court then set forth the materiality standard applicable to *Brady* claims:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.  A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.

*Id.* at 682.  This materiality standard is the same as the prejudice analysis for ineffective assistance of counsel claims set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984).[10]  *See Brown v. Head*, 272 F.3d 1308, 1316 (11th Cir. 2001).

### 3.      Federal Review of Claim

The Florida Supreme Court correctly cited *Brady* as the proper legal standard for analyzing this claim and applied those standards to Petitioner's claims.  *Grim II,* 971 So. 2d at 93.  Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Brady*.

The state court found that Petitioner had satisfied the first two prongs of *Brady* because the State failed to disclose impeachment evidence that was favorable to the defense.  However, the state court found that Petitioner had not satisfied the prejudice prong of the *Brady* standard because he did not present any evidence challenging the validity of the autopsy performed by Dr. Berkland nor did he provide

---

[10] Under *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984), the prejudice standard is that "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome."

any evidence contradicting Dr. Berkland's conclusion that a sexual battery on the victim had occurred. Therefore, the court held that its confidence in the outcome of Petitioner's trial had not been undermined by the failure to disclose the evidence at issue.

Based on the state court's determination, this court will focus its analysis of the claim on whether the state court unreasonably applied the materiality prong of the *Brady* standard to the facts of Petitioner's case. Petitioner contends that the evidence that Ms. Campbell had been vaginally penetrated with an object and thus the victim of sexual battery, was "exclusively the opinion of Dr. Berkland." Doc. 1 at 19. He contends that the State had a "tenuous, at best," case for premeditated murder and that without the sexual battery there would have been no basis for a felony murder charge so no first-degree murder charge could have been brought. *Id*. Respondents concede that the trial court's finding that Ms. Campbell had been sexually battered "was premised almost exclusively" on Dr. Berkland's testimony. Doc. 9 at 26. However, Respondents contend that the state court's evaluation of this claim is not an unreasonable application of *Brady*, and Petitioner has not satisfied the materiality standard in this case.

Petitioner has the burden under *Brady* and its progeny to establish whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Strickler*, 527 U.S. at 290. He does not have to prove that he "would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles*, 514 U.S. at 434. With regard to the materiality analysis, the Eleventh Circuit has explained the process in part as follows:

> Once the evidence on the scales is adjusted to take into account the combined force and effect of the undisclosed evidence favorable to the defense, the standard that is applied is not one of sufficiency of evidence to convict. It is instead whether what is left on both sides of the scale after adjusting for the withheld evidence creates a reasonable

probability that a jury would acquit, and a reasonable probability is one sufficient to undermine our confidence in the guilty verdict.

*Smith v. Sec'y, Dept. of Corrs.*, 572 F.3d 1327, 1347 (11th Cir. 2009)(citing *Kyles*, 514 U.S. at 453).

As an initial matter, Respondents focus on the overwhelming evidence of Petitioner's guilt for the murder of Ms. Campbell; however, the issue here is not whether Petitioner committed the murder, but whether the trial court's finding that the murder occurred during the commission of a sexual battery was error. In this case, the sexual battery evidence supported both the first-degree murder conviction and the trial court's finding of an aggravating factor for purposes of the death sentence.[11] A review of the record shows that the State argued both premeditation and sexual battery to support a first-degree murder conviction, and the jury was instructed on both. *See* T. Vol. IV at 761-62 and 782-85. Because the jury could have found that the crime was premeditated, Petitioner has not satisfied this court that he could not have been convicted of first-degree murder had the sexual battery evidence been totally discounted by the jury. Therefore, even if the jury discounted all of the evidence of sexual battery in this case, Petitioner would still be eligible for the death sentence based on a premeditated first-degree murder conviction. *See Strickler*, 119 U.S. at 294 ("The jury was instructed on two predicates for capital murder: robbery with a deadly weapon and abduction with intent to defile. . . . Even assuming, however, that this [abduction with intent to defile] predicate was erroneous, armed robbery still would have supported the capital murder conviction").

With regard to whether Petitioner has demonstrated a *Brady* violation, *i.e.*, whether the impeachment evidence regarding Dr. Berkand was material, a review of Dr. Berkland's testimony at trial is necessary. Dr. Berkland testified at trial about the

---

[11] The trial court also found two additional aggravating circumstances: (1) the murder was committed by a person under sentence of imprisonment; and (2) the defendant had prior convictions for violent felonies. *See Grim I.*

autopsy he performed on Ms. Campbell and described the extensive antemortem wounds inflicted upon her by her assailant. Dr. Berkland opined that Ms. Campbell's death was caused by complications of both blunt force trauma to the head, thought to be caused by a hammer, and multiple stab wounds to the chest T. Vol. III at 587-88. Specifically with regard to injuries to her vaginal area, Dr. Berkland testified on direct examination by state prosecutor, Mr. Molchan, as follows:

[Molchan]: Now, did you also examine her in her vaginal area?

[Berkland]: Yes, I did.

[Molchan]: Now, prior to when you–did you observe any injuries near her legs in that area?

[Berkland]: She had some bruising down in one of her thighs that were small little bruises, and she actually had a number of bruises in other aspects of her arms and stuff too, but these are sort of the major injuries that we have been showing. She also had a couple of other incised wounds.

[Molchan]: Did you find an injury to her–actually her vaginal orifice or in that area?

[Berkland]: Yes, I did.

[Molchan]: I show you 7-J which you got now. If you could orient to 7-J for the jurors, that one portion of that?

[Berkland]: 7-J depicts an up-close photograph of the sort of perineal area, the undersurface and the back of the vagina. These would be where the labia come together, and instead of coming together right here in the center, there is a large laceration here, once again, and you can see the dark discoloration of blood in the deep tissue showing that, once again, this is also an antemortem injury.

In other words, the heart was beating and put the blood out in this area with the beating heart as the vessels were torn. So all of the injuries that we see here are antemortem injuries, and this is a fairly significant laceration that starts extending back down into the perineum.

[Molchan]: Now, when you say laceration, are you meaning it was cut with a knife or what?

[Berkland]: No, this was a tearing or bruising of the tissues down here, once again, applying blunt force trauma and tearing of the tissues, so something caused that laceration.

[Molchan]: How would it have been caused, in your opinion, to a reasonable degree of medical certainty?

[Berkland]: Well, it's a very significant laceration. There was something that was probably inserted in there, and then either roughly inserted or roughly pulled back out at an angle to cause that kind of tearing.

[Molchan]: So there would have been penetration of the vaginal area?

[Berkland]: Yes.

[Molchan]: And would that have occurred when the person was alive or at least the heart was beating?

[Berkland]: That's correct.

[Molchan]: And is there a particular area that you call this as far as the injury?

[Berkland]: What we call medically, the posterior fourchette region, lower portion of the female tract.

*Id.* at 584-86. On cross-examination by defense attorney, Mr. Hill, Dr. Berkland testified with regard to the vaginal injuries as follows:

[Hill]: Now, is there any way for you to determine at what point the injuries to the vaginal area was done in relation to the other injuries?

[Berkland]: No, sir, there's not.

[Hill]: Now, you indicated that the injury that was done to the vaginal area was blunt force trauma; is that correct?

[Berkland]: That's correct.

[Hill]: And I'm assuming by that, that you mean that this was not some type of sexual relationship with someone else, I mean, what you typically think of in a sexual battery or sexual intercourse?

[Berkland]: That's correct.

[Hill]: And isn't it possible that that type of wound could have been done in some fashion other than by penetration?

[Berkland]: It's an extensive deep wound that extends on into the internal portion of the vaginal vault.  I don't think any sort of external application of force would cause that extensive tearing inside the vaginal wall.  I think it's something applied inside with more of a tearing action coming out.

[Hill]: And you have no way of knowing whether that was intentional or by accident, correct?

[Berkland]: I would not think that would be something accidental.

[Hill]: Okay, but you have no way of knowing that; is that correct?

[Berkland]: No, I wouldn't.

*Id.* at 590-91.  The photograph relevant to this testimony, 7-J, was admitted into evidence.  *Id.* at 572.

The impeachment evidence at issue encompasses several documents sent via facsimile to the state attorney's office in October of 1998 regarding Dr. Berkland's termination by the Jackson County, Missouri, medical examiner and an order granting a preliminary and permanent injunction prohibiting Dr. Berkland from performing autopsies and serving as a medical examiner in the Sate of Missouri.[12]

---

[12]  The postconviction court summarized the materials as follows: "[t]he materials referred to consist of a fax containing an article from the Daily News, Order Granting Preliminary and Permanent Injunction, a letter addressed to the State Board of Registration for the Healing Arts dated December 26, 1996, letter to Jackson County Deputy Prosecuting Attorney dated November 22, 1996, memorandum addressed from Thomas Young to Michael E. Berkland dated December 29, 1995, newspaper article dated November 11, 1997, Termination of Agreement for Medical Services Memorandum dated January 10, 1996, Memorandum dated December 29, 1995." These documents are attached to the postconviction court's Order on Defendant's Motion to Vacate Judgment and Sentences with Special Request for Leave to Amend, Exhibit # 2, PCR at 266-88.

The injunction states in part that Dr. Berkland "poses a substantial probability of serious danger to the health, safety and welfare of his patients, clients, and/or residents of Missouri;" he "falsified eight autopsy reports by indicating that he had sectioned the brains of the decedents and by making findings and determinations based upon the sectioning when he had not actually sectioned the brains;" and he "either totally disregarded the potential consequences of his conduct or failed to understand the potential consequences of his conduct." Exhibit # 2, Postconviction Record ("PCR") at 270-71.

Dr. Berkland was deposed in March of 1999, at which time the Missouri charges were raised.[13] Dr. Berkland explained the situation as "office politics:"

> The incoming medical examiner [Dr. Young] and me ran into some problems. He elected to terminate me for probably a variety of reasons. Well after the fact I had already been gone, I started encountering him in court and I started meeting him on the defense side. He had had some errors in some of the autopsies and stuff that he had performed and the defense found some of these things to be useful. At which point, I was sort of causing him some embarrassment then in the court system.

PCR at 363-64. Dr. Berkland explained the allegations regarding the unsectioned brains as a dictation error made when his secretary inserted stock language into the reports which he failed to catch and were submitted to the state board because of his problems with Dr. Young. *Id.* at 364-65. He testified that in none of the cases involving the unsectioned brains was the cause or manner of death affected. *Id.* at 365. Dr. Berkland testified that the injunction was the result a default because he was out of town and unable to attend the hearing. *Id.* He stated that the medical examiner's office in Florida was aware of the situation in Missouri and was not concerned about it. *Id.* at 366-67. The Daily News article attached as part of the

---

[13] Respondents contend that the defense was aware of the *Brady* impeachment evidence pursuant to this deposition. For purposes of this habeas review, this court will not address the suppression prong of the *Brady* standard and accept the Florida Supreme Court's determination that the state suppressed the evidence at issue.

exhibit quotes the First Judicial Circuit Medical Examiner, Dr. Cumberland, as saying that he has "full confidence" in Dr. Berkland and that he "has done a good job here." Exhibit #2, PCR at 267.

Petitioner contends the defense would have used the evidence of Dr. Berkland's professional problems in Missouri to impeach his qualifications and the credibility of his medical findings had this evidence been produced by the State. While certainly this evidence is favorable to the defense, as noted by the postconviction court in its order denying collateral relief, "the injuries described were observable by anyone because Dr. Berkland was describing a photograph of the injuries."  Order on Defendant's Motion to Vacate Judgment and Sentences with Special Request for Leave to Amend ("Postconviction Order") PCR at 190.  Thus, the jury was able to see a photograph of the injuries to the vaginal area and did not rely on Dr. Berkland's testimony alone on the question of whether an injury had occurred.  The postconviction court also noted that defense attorney Hill "testified that Dr. Berkland's testimony described an injury that was obviously there and the manner it was made based on his professional opinion and 'there was no evidence to dispute that.'"  *Id.* (quoting Evidentiary Hearing ("EH") Vol. I at 223).

While the impeachment evidence at issue was relevant to Dr. Berkland's qualifications as a pathologist, it was not the kind of evidence which showed that he was an interested or biased witness.  Given the photographic evidence which was presented in conjunction with Dr. Berkland's testimony, the jury could reasonably have determined that his testimony as to the injuries sustained by Ms. Campbell was credible.  Furthermore, if Dr. Berkland had been impeached with this evidence, it is reasonable to conclude that he would have explained the Missouri charges as he had during his deposition, and the jurors may have found his explanation credible.  As the Florida Supreme Court recognized, there was no other evidence presented or proffered which demonstrated that Dr. Berkland's findings were erroneous.

Given these considerations, this court finds that the impeachment evidence is not material under the *Brady* standard.  This court is not persuaded that "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435. This is not a case where a testifying witness had entered into a plea agreement with the prosecution, and this information was not disclosed to the jury or where the witness was an otherwise interested party.  *See e.g., Giglio*, *supra*, 405 US. at 154-55 ("Taliento's credibility as a witness was therefore an important issue in the case, and evidence of any understanding or agreement as to a future prosecution would be relevant to his credibility and the jury was entitled to know it."); *Kyles*, *supra*, 514 U.S. at 454 ("But confidence that the verdict would have been unaffected cannot survive when suppressed evidence would have entitled a jury to find that the eyewitnesses were not consistent in describing the killer, that two out of the four eyewitnesses testifying were unreliable, that the most damning physical evidence was subject to suspicion, that the investigation that produced it was insufficiently probing, and that the principal police witness was insufficiently informed or candid."); *Banks v. Dretke,* 540 U.S. 668, 702, 124 S. Ct. 1256, 1279,157 L. Ed. 2d 1166 (2004)("At least as to the penalty phase, in sum, one can hardly be confident that Banks received a fair trial, given the jury's ignorance of [informant] Farr's true role in the investigation and trial of the case").

The state court's factual findings are supported by the record and must be given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.   Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court precedent or in an objectively unreasonable manner in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or

reached a decision contrary to, clearly established federal law.  Therefore, Petitioner is not entitled to habeas relief on this ground.

b.      Ineffective Assistance of Counsel

Petitioner also contends that his defense counsel was or should have been aware of the impeachment evidence related to Dr. Berkland and was ineffective in failing to discover or utilize it.  Doc. 1 at 51.

1.      State Court Proceedings

Petitioner raised this claim in his postconviction proceeding and was denied relief by the postconviction court.  The Florida Supreme Court affirmed, explaining as follows:

> Grim also argues that Hill's failure to impeach Berkland based on the March 1999 deposition constitutes ineffective assistance of counsel. To prove ineffective assistance, a defendant must establish both deficient performance and prejudice. *See, e.g., Jones v. State*, 928 So.2d 1178, 1183 (Fla.2006). "To establish deficient performance, a petitioner must demonstrate that counsel's representation 'fell below an objective standard of reasonableness.' " *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). To prove prejudice, a defendant must establish " 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' A reasonable probability is a 'probability sufficient to undermine confidence in the outcome.' " *Smith*, 931 So.2d at 800 (citation omitted) (quoting *Strickland*, 466 U.S. at 694, 104 S. Ct. 2052). On appeal, we defer to factual findings that are supported by competent, substantial evidence, but review legal conclusions de novo. *Henry v. State*, 937 So.2d 563, 569 (Fla.2006).
>
> Berkland's deposition testimony contains valuable impeachment evidence. Berkland was an important witness for the State, and it would have been reasonable to impeach him with evidence of the revocation of his Missouri license. Therefore, we agree that counsel's failure to cross-examine Berkland with this evidence constitutes deficient performance. However, Grim failed to establish prejudice. As explained in our *Brady* analysis above, Grim failed to present any evidence that Berkland's autopsy or trial testimony was erroneous. Therefore, Grim fails to demonstrate a reasonable probability that but for counsel's

deficient performance the outcome of his trial would have been different. Counsel's failure to impeach does not undermine confidence in the outcome of Grim's trial. Therefore, the trial court properly denied this claim.

*Grim II*, 971 So.2d at 93-94.

2.      **Clearly Established Supreme Court Law**

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). To obtain relief under *Strickland*, a habeas petitioner must show (1) deficient performance by counsel and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different. *Id.*, 466 U.S. at 687. It is the petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable and that he suffered prejudice as a result thereof. *Id*. If a petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief. *Id.* at 697.

In determining whether counsel's performance was reasonable, the Court instructed:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133–134, 102 S. Ct. 1558, 1574–1575, 71 L. Ed.2 d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy." *See Michel v. Louisiana*, *supra*, 350 U.S. at 101, 76 S. Ct. at 164.

*Strickland*, 466 U.S. at 689. Regarding the prejudice prong of the *Strickland* standard, the Supreme Court has cautioned that "'[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Strickland*, 466 U.S. at 693. The Court has also clarified, however, that a petitioner need not demonstrate it "more likely than not, or prove by a preponderance of evidence," that counsel's errors affected the outcome. *Strickland*, 466 U.S. at 693–94. Instead,

> [t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Id.* at 694. The prejudice assessment does "not depend on the idiosyncracies of the particular decisionmaker," as the court should presume that the judge or jury acted according to law. *Strickland*, 466 U.S. at 694–95. "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

> In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury. Some of the factual findings will have been unaffected by the errors, and factual findings that were affected will have been affected in different ways. Some errors will have had a pervasive effect on the inferences to be drawn from the evidence, altering the entire evidentiary picture, and some will have had an isolated, trivial effect. Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support. Taking the unaffected findings as a given, and taking due account of the effect of the errors on the remaining findings, a court making the prejudice inquiry must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors. . . . [T]he ultimate focus of inquiry must be on the fundamental fairness of the proceeding whose result is being challenged.

*Id.* at 695–96.

### 3. Federal Review of Claim

The Florida Supreme Court cited *Strickland* as the legal standard applicable to claims of ineffective assistance of counsel and applied this standard to Petitioner's claims. *Grim II,* 971 So. 2d at 94. The state court, therefore, applied the correct legal rule based on Supreme Court precedent. While the state court found that Petitioner's counsel's performance was deficient, it also found that Petitioner had failed to satisfy the prejudice prong of the *Strickland* standard because he did not present any evidence that the autopsy results or Dr. Berkland's testimony about the results was erroneous. Therefore, Petitioner had failed to demonstrate a reasonable probability that, but for his counsel's deficient performance, the outcome of his trial would have been different. Based on the state court's determination, this court will focus its analysis of the claim on whether the state court unreasonably applied the prejudice prong of the *Strickland* standard to the facts of Petitioner's case.

Once again Respondents incorrectly focus on the overwhelming evidence of Petitioner's guilt for the murder of Ms. Campbell, not the evidence that a sexual battery occurred. Nevertheless, based on the same reasoning that supports this court's denial of Petitioner's *Brady* claim, Petitioner has not satisfied the prejudice prong of *Strickland* with regard to the impeachment evidence related to Dr. Berkland. While the impeachment evidence could reasonably have impacted the jury's evaluation of Dr. Berkland's testimony in favor of the defendant, Petitioner has not demonstrated that the outcome of his trial would have been different had his counsel presented the impeachment evidence. Without more, this court cannot conclude that the state court's determination of this was unreasonable.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the

United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground III:    Ineffective Assistance of Counsel/ Penalty Phase

    A.    Failure to present a viable mental health defense

Petitioner alleges that he was deprived of effective assistance of counsel by his attorney's failure to adequately investigate and present a viable mental health defense. Petitioner alleges that his counsel became aware prior to trial that he was using various drugs, both illicit and prescribed, drinking excessively and smoking marijuana during the time just prior to the murder of Ms. Campbell. He alleges that his counsel did not investigate a defense involving this information, including a drug interaction and intoxication defense. Petitioner contends that if his counsel had consulted with an expert in neuropharmacological issues, he would have been able to develop a multi-faceted defense based on Petitioner's intoxication, use of drugs, brain damage and intermittent explosive disorder. Had this evidence been presented Petitioner believes he would have been able to show that he was psychotic at the time of the murder and unable to form the requisite premeditation, and there is a reasonable probability that the outcome of his trial would have been different. Doc. 1 at 72-73.

    1.    State Court Proceedings

Petitioner raised this issue in his postconviction collateral proceedings, and the postconviction court denied relief. The Florida Supreme Court affirmed, explaining as follows:

> Grim argues that trial counsel rendered ineffective assistance by failing to investigate and present (through the use of a neuropharmacological expert) a "multi-faceted defense" based on Grim's "intoxication, use of prescribed and illicit drugs, brain damage, and intermittent explosive disorder." The trial court rejected this claim, concluding counsel was limited by Grim's lack of cooperation. The trial court also found that

"defense counsel conducted a sufficient investigation and made a reasonable professional decision not to secure the services of a neuropharmalogical expert based on the facts of this case." We agree.

Grim was represented at trial by Richard Hill and Michael Rollo. Hill was primarily responsible for the guilt phase and Rollo for the penalty phase. Rollo contacted Dr. James Larson, a psychologist, who had several meetings with counsel and interviewed and performed psychological testing on Grim. Larson testified at the evidentiary hearing that Grim previously had been diagnosed with intermittent explosive disorder and antisocial personality disorder and had been treated with Depakote and Prozac. He further testified that Grim abused alcohol. Testing showed "red flags" indicating possible brain damage or an organic brain problem. Larson repeatedly testified that he discussed various defenses with counsel and Grim, but Grim was adamant that he was interested only in exoneration and did not want such information used. Hill testified that the defense at trial was basically one of reasonable doubt. He further testified that he discussed other defenses with Grim, including a possible intoxication defense, but Grim adamantly refused-he wanted a not guilty verdict or the death penalty. Although Hill had numerous conversations with Grim and advised him that the chances of success were small, Grim did not change his mind.

After rejecting all lowered culpability defenses at trial, Grim now claims counsel was ineffective for failing to investigate and present a defense based on a combination of his voluntary intoxication, drug use, brain damage, and intermittent explosive disorder. We conclude the decision not to employ another expert was reasonable. Trial counsel was aware of Grim's possible brain damage, explosive disorder, use of prescribed drugs, and history of substance abuse. Trial counsel discussed with Grim a possible intoxication defense, but Grim repeatedly refused any defense that would require an admission of guilt or would result in anything other than exoneration. We rejected a similar claim in *Henry*:

> [T]he record is clear that Henry was adamant that trial counsel not rely on any evidence of intoxication or addiction in Henry's defense, in either the guilt or penalty phases. "When a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made."

937 So.2d at 571 (quoting *Rose v. State*, 617 So.2d 291, 294 (Fla.1993)). This is not a situation where trial counsel was unaware of the facts underlying a possible defense or completely failed to discuss a possible defense with the defendant. Hill and Larson both discussed possible intoxication-type defenses with Grim. The decision not to hire another expert was based on Grim's refusal to consider a defense that would require an admission of guilt. *See Henry*, 937 So.2d at 573 ("'[T]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.' ") (quoting *Stewart v. State*, 801 So.2d 59, 67 (Fla.2001)). Therefore, Grim's claim fails the first *Strickland* prong.

Further, there is no prejudice. Grim would not even allow counsel to utilize Larson at trial. Had trial counsel consulted another expert, there is no evidence that Grim would have changed his mind and permitted trial counsel to use that expert. Trial court findings that Grim's lack of cooperation limited trial counsel and that trial counsel conducted a reasonable investigation are supported by competent, substantial evidence.

*Grim II*, 971 So.2d at 95-96.

2.      **Clearly Established Supreme Court Law**

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

3.      **Federal Review of Claim**

The Florida Supreme Court cited *Strickland* as the legal standard applicable to claims of ineffective assistance of counsel and applied this standard to Petitioner's claims. *Grim II,* 971 So. 2d at 94. The court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

The postconviction court made the following findings on Petitioner's claim that his attorneys were deficient in failing to present a viable defense such as intoxication:

Regardless of the client's refusal to cooperate, the Court finds that defense counsel did not neglect his duty to investigate. Trial counsel testified that he talked with the Defendant, reviewed the discovery

conducted prior to his appointment, hired a DNA expert who informed defense counsel there was no basis to challenge the DNA evidence, hired a private investigator, and hired Dr. Larson who in turn reviewed the Defendant's psychological history, interviewed the Defendant, and proffered an opinion as to the Defendant's mental health and mitigation factors. Furthermore, defense counsel testified that he considered pursuing a mental defense and was aware of and previously used a toxicology expert but the Defendant refused to consider any strategy which would require an admission of guilt with lessened culpability. Hence, the Court finds that the defense counsel conducted a sufficient investigation and made a reasonable professional decision not to secure the services of the neuropharmalogical expert based on the facts of this case. *See Johnson v. Singletary*, 162 F.3d 630, 642 (11th Cir. 1998)(when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless, counsel's failure to pursue those investigations cannot later be challenged as unreasonable).

Postconviction Order, PCR at 196-97 (record citations omitted).

The record is uncontroverted that Petitioner would not consent to any defense in which he conceded he had killed Ms. Campbell. Petitioner's lead attorney, Richard Hill, testified that the defense strategy in the case was to argue reasonable doubt because "[b]asically, [Petitioner] either wanted a not guilty or he wanted the death penalty, and he was very adamant about that from the first day I talked to him all the way through trial." EH Vol. I at 167. Mr. Hill testified that he believed that Petitioner had the right to make the decision not to present any other defense and explained:

Because [Petitioner] knew exactly–the first time I ever talked to him exactly what the procedure was. He had been to prison before. He knew exactly what he was looking at, what the alternatives were, what the penalty phase was about, what defenses were available. He didn't want any defense, as I said before, of anything where there would basically have to be an admission of guilt such as voluntary intoxication, anything of that nature. He knew what the lessers [lesser included offenses] were. He knew if he was convicted of a lesser that he would go in the general population, and he didn't want that. He basically as I said over and over, either wanted to walk out not guilty or he wanted the death penalty.

*Id*. at 175-76. Specifically with regard to an involuntary intoxication defense, Mr. Hill testified that this defense "very rarely" is successful, and Petitioner would not agree

to pursue this defense because he would not agree to admit he was responsible for the crime. *Id.* at 179. Petitioner also rejected any type of insanity defense for the same reason. *Id.* at 180. While Petitioner wanted to pursue a defense that someone else perpetrated the crime, the court's ruling which prevented the hearsay testimony regarding Henry Company Homes precluded this. *Id.* at 181. Mr. Hill did not believe he would be successful arguing reasonable doubt given the amount of evidence of Petitioner's guilt. *Id.* at 185, 225. Mr. Hill had numerous discussions with Petitioner and advised him that the chances of being successful with their defense strategy were "very small." *Id.* at 226.

Additionally, Michael Rollo, who was the second chair co-counsel and primarily responsible for the penalty phase, testified at the evidentiary hearing that he was advised by Petitioner's prior public defender, Antoinette Stitt, that Petitioner had a desire "to go all out in the guilt phase," and the defense "left no stone unturned as far as development of the guilt phase." EH Vol. II at 11, 13. Specifically with regard to Petitioner's drug use as a potential avenue for a guilt phase defense, Mr. Rollo testified that "all of the interview notes from Ms. Stitt, such as there were, and the personal interviews of Mr. Grim indicated that it was really a questionable defense, if any, because he seemed to indicate that he knew what he was doing." *Id.* at 14-15. Mr. Rollo further explained that Petitioner's "self-concept was such that [an intoxication defense] would make him feel lesser of a person to kind of present to the jury that by reason of ingestion of A, B, C and D didn't really know what he was doing." *Id.* at 35. Petitioner "always viewed himself as a person who was in control of his faculties and of his thinking processes no matter what medication he may have been taking or what alcohol he had consumed and that's just the kind of guy he was." *Id.* With regard to the defense strategy that Petitioner wanted to employ, that someone else committed the crime, Mr. Rollo found this to be a very difficult strategy to use, particularly "[i]n the face of the most overwhelming evidence I have seen in a case absent a confession."

*Id.* at 36. When asked whether the defense strategy preferred by Petitioner was against his best interest, Mr. Rollo elaborated as follows:

> The evidence, the volume of evidence in this case, the physical evidence was so overwhelming that to try to claim somebody else did it, I think that's ill-advised. I mean, if the object were to confess what you have done and avoid the consequence, then you would have wanted to go to a big penalty phase, and you know, essentially show remorse and try to convince a jury that you should spend the rest of your life in prison rather than be put to death, but again, putting the cart before the horse, he didn't want that so then you're left with presenting really an absurd defense, and I think it's ill-advised and it shortened the deliberation process.

*Id.* at 39.

Petitioner did not testify during the postconviction proceedings nor has he demonstrated that his attorneys' testimony with regard to Petitioner's instructions on a defense strategy were inaccurate.[14] In his habeas petition, Petitioner focuses on the medical evidence that he alleges would have provided a viable defense to the crime. The petition states, "[h]ad that evidence been presented, Petitioner would have been able to show that he was psychotic and unable to premeditate any alleged murder. *Inexplicably*, trial counsel failed to even investigate the potential of this defense." Doc. 1 at 73 (emphasis added). What Petitioner fails to address in his petition is his own participation in the crafting of a defense strategy and his steadfast refusal to consider a defense in which he admitted to committing the crime. While the defendant retains the right to control his defense at trial, counsel must first advise his client which strategies offer the best chance of success. *Thompson v. Wainwright*, 787 F.2d 1447, 1451 (11th Cir.1986). Once this is done, counsel is not required to impose a strategy on a competent but unwilling client. A defendant's instructions may limit the scope of counsel's duty to investigate a particular defense or strategy. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially

---

[14] The record reflects that Petitioner testified that he wanted no mitigation evidence presented after the jury returned its verdict after the guilt phase during a hearing pursuant to *Koon v. Dugger*, 619 So.2d 246 (Fla. 1993), and he reaffirmed this position during a hearing pursuant to *Spencer v. State*, 691 So.2d 1062 (Fla. 1996) conducted before the trial court. *See* T. Vol. IV, Tab N at 813, 819 and Tab U at 554.

influenced by the defendant's own statements or actions"). *See also Mitchell v. Kemp*, 762 F.2d 886, 889 (11th Cir.1985)("When a defendant preempts his attorney's strategy by insisting that a different defense be followed, no claim of ineffectiveness can be made); *Mulligan v. Kemp*, 771 F.2d 1436, 1442 (11th Cir. 1985)(noting that a defendant's Sixth Amendment rights are his alone and "if [counsel] is commanded by his client to present a certain defense, and if he does thoroughly explain the potential problems with the suggested approach, then his ultimate decision to follow the client's will may not be lightly disturbed").

Petitioner contends that the state court's opinion is contrary to *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003) and *Rompilla v. Beard*, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed.2d 360 (2005). Petitioner misconstrues the holdings of these cases which generally require that a capital defendant's counsel must conduct a substantive investigation into the client's background, either because it could yield persuasive mitigating evidence or when elements of his background will be used as an aggravating circumstance to support the imposition of the death penalty. The record reflects that Petitioner's defense counsel were aware of a possible intoxication defense, and discussed the possibility of using this defense with their medical expert Dr. Larson and with Petitioner. This circumstance can be likened to cases in which a defendant instructs his counsel to present no mitigation case during the penalty phase of a capital case. *See Gilreath v. Head*, 234 F.3d 547, 550 n. 10 (11th Cir.2000) ("We readily conclude that trial counsel--by relying on Petitioner's instruction not to present mitigating mental health and alcohol abuse evidence--did not perform in an unreasonable manner."). The duty to investigate "does not include a requirement to disregard a mentally competent client's sincere and specific instructions about an area

of defense and to obtain a court order in defiance of his wishes." *Rutherford v. Crosby*, 385 F.3d 1300, 1313 (11th Cir.2004).[15]

Furthermore, a competent defendant's clear instruction not to investigate or present mitigation evidence also impacts the prejudice prong of the *Strickland* analysis. Recently, in *Schriro v. Landrigan*, 550 U.S. 465, 127 S. Ct. 1933, 167 L. Ed. 2d 836 (2007), the Supreme Court held that it was not objectively unreasonable for a postconviction court to conclude that a defendant who refused to allow the presentation of any mitigating evidence could not establish prejudice under *Strickland*. *See id*., 550 U.S. at 475 ("[i]f Landrigan issued such an instruction [to his counsel not to offer any mitigating evidence], counsel's failure to investigate further could not have been prejudicial under *Strickland*"). The Supreme Court emphasized that in denying the habeas petition, the "District Court was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence." *Id*. at 477. The Florida Supreme court made the same determination in this case, *i.e.*, that even if another expert had been obtained by trial counsel, there is no evidence that Petitioner would have allowed his counsel to utilize the expert. Thus the state court determined that Petitioner could not establish either the deficient performance prong nor the prejudice prong of *Strickland*. *See Grim II*, 971 So.2d at 96.

Based on a review of the record, the Florida court's determination that trial counsel was aware of, yet rejected, other possible defenses based on Petitioner's refusal to consider a defense that would require an admission of guilt was a reasonable determination of the facts. Defense counsel was not ineffective because

---

[15] Additionally, Mr. Rollo had Petitioner evaluated by Dr. James Larson, a forensic psychologist, in order to evaluate Petitioner's mental health and determine possible mitigation evidence. *Cf*., *Blanco v. Singletary*, 943 F.2d 1477, 1502 (11th Cir.1991) (noting that counsel did not have a psychiatrist or psychologist examine Blanco, did no investigation at all before the penalty phase, never discussed any potential mitigation avenues with Blanco, and "had a greater obligation to investigate and analyze available mitigation evidence" because Blanco was, among other things, "noticeably morose and irrational," "depressed and unresponsive," and "uncommunicative and easily angered").

they could not persuade Petitioner to consider a strategy other than one of reasonable doubt.  The state court's factual findings are supported by the record and must be given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.  Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the  United States Supreme Court or in an objectively unreasonable manner in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**B.     Failure to move to disqualify trial judge**

Petitioner contends that his counsel was ineffective for failing to move for disqualification of the trial judge, Judge Kenneth Bell, under Florida Rule of Judicial Administration 2.160.  Judge Bell disclosed to both parties at a motion hearing in July of 2000 that he had represented Henry Company Homes in real estate transactions prior to taking the bench in 1991.  He also disclosed that he had recused himself in several cases because of this relationship with Henry Company Homes.  Petitioner alleges that Judge  Bell's relationship with the company "created a fear in [him] that Judge Bell could not be fair."  Doc. 1 at 81.  Petitioner further alleges that this fear came to fruition when Judge Bell would not admit the hearsay statements implicating Henry Company Homes in the murder of Ms. Campbell, thereby crippling his defense.

**1.     State Court Proceedings**

Petitioner raised this claim in his postconviction proceedings, and the postconviction court denied relief.  The Florida Supreme Court affirmed, holding as follows:

> Grim next argues that counsel was ineffective for failing to seek the judge's disqualification. His argument concerns defense counsel's attempted introduction of the victim's hearsay statements. The victim was

an attorney in litigation adverse to Henry Company Homes, and representatives of that company allegedly threatened her. Defense counsel sought to introduce the victim's statement, among others, that "If I ever end up dead in the bay, point your finger at Henry Homes." *Grim*, 841 So.2d at 462-63. The trial court found the statements inadmissible, and we affirmed on direct appeal. *Id*. at 464. At a pretrial hearing, the trial judge informed the parties that before becoming a judge in 1991, he was a real estate attorney and did real estate closings for Henry Homes. Grim claims counsel was ineffective for failing to seek disqualification. The trial court properly rejected this claim.

"A motion to disqualify will be dismissed as legally insufficient if it fails to establish a well-grounded fear on the part of the movant that he will not receive a fair hearing." *Griffin v. State*, 866 So.2d 1, 11 (Fla.2003). The record refutes any notion that Grim feared an unfair hearing.FN6 The trial judge explained the potential conflict and gave Grim the opportunity to object, but he did not. Hill testified at the evidentiary hearing that he spoke with Grim regarding the trial judge's disclosure and Grim did not have a problem with the judge staying on the case. Trial counsel is not ineffective for failing to file a legally insufficient motion to disqualify. *See*, *e.g., Waterhouse v. State*, 792 So.2d 1176, 1194-95 (Fla.2001) (rejecting ineffective assistance claim for failure to seek recusal where the merits of the motion would not have warranted the judge's recusal); *Griffin*, 866 So.2d at 11 (finding the *Strickland* prejudice prong could not be met where, even if counsel had moved for recusal, he would not have prevailed).

> FN6. The State argues this claim is waived. *See* § 38.02, Fla. Stat. (2000) ("[S]uggestions [of disqualification] shall be filed in the cause within 30 days after the party filing the suggestion, or the party's attorney, or attorneys, of record, or either of them, learned of such disqualification, otherwise the ground, or grounds, of disqualification shall be taken and considered as waived."); *Schwab v. State*, 814 So.2d 402, 408 (Fla.2002) (noting that the defendant, "with the advice of counsel, waived his right to file a motion to recuse the judge, having specific knowledge of the allegations of judicial bias"). Because the claim, on its merits, is refuted by the record, we decline to address whether the claim was waived. *See Mansfield v. State*, 911 So.2d 1160, 1170 (Fla.2005).

Grim claims that the exclusion of the victim's hearsay statements demonstrates prejudice. However, on direct appeal we affirmed the inadmissibility of these statements. *Grim*, 841 So.2d at 464. Appellant has not pointed to anything that shows the trial judge was biased or that otherwise undermines confidence in the outcome of the proceeding. For these reasons, Grim has failed to satisfy either *Strickland* prong, and we affirm the trial court's denial of this claim.

*Grim II*, 971 So.2d at 96-97.

Additionally, the postconviction court also found as follows with regard to this claim:

In the instant case, the Court is of the opinion that the defense counsel's testimony FN indicates that the basis for not moving for recusal during the evidentiary hearing was a professional decision reached after discussion with his client and an assessment of the facts of the case. It's apparent that defense counsel made a reasonable decision that there was no direct relationship with Henry Homes that would render the trial judge prejudicial and discussed the available options with his client. Of particular note when defense counsel asked his client's position on the matter, he expressed he did not have any problems with the trial judge presiding over the case.

FN Defense counsel testified he was aware of the standard for recusal and felt that it was not applicable to the facts of this case.

Postconviction Order, PCR at 195-96 (record citations omitted).

2. **Clearly Established Supreme Court Law**

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

3. **Federal Review of Claim**

The state court found that had the defense filed a motion to disqualify, the motion would have been denied as legally insufficient because the record did not support Petitioner's claim of a well-grounded fear that he would not receive a fair hearing. The court, therefore, held that trial counsel was not ineffective for failing to file a legally insufficient motion to disqualify. The court also found that Petitioner had failed to demonstrate prejudice because he had not pointed to any facts showing that

the trial judge was biased or that otherwise undermined confidence in the outcome of the proceeding. *Grim II*, 971 So.2d at 96.

Regarding the legal sufficiency of a motion to recuse the trial judge, this court is bound by the state court's interpretation of state law. *See Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S. Ct. 602, 604, 163 L. Ed. 2d 407 (2005) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). Because the state court concluded there was no legal basis for the disqualification of Judge Bell under Florida law, Petitioner cannot demonstrate deficient performance of his counsel in failing to file a motion for disqualification nor can he demonstrate prejudice. *See Lockhart v. Fretwell*, 506 U.S. 364, 374, 113 S. Ct. 838, 845, 122 L. Ed.2d 180 (1993) ("the court making the prejudice determination may not consider the effect of an objection it knows to be wholly meritless under current governing law....") (O'Connor, J. concurring); *Ladd v. Jones*, 864 F.2d 108, 110 (11th Cir.1989) (holding where "claims were meritless, it was clearly not ineffective for counsel not to pursue them.").

Petitioner argues that he had a well-grounded fear that Judge Bell's potential conflict of interest would prevent Petitioner from receiving a fair trial. However, Petitioner has cited no Supreme Court precedent addressing the recusal of a trial judge under similar circumstances on the basis of the appearance of bias nor has he cited a case involving a *Strickland* claim on this issue. According to the Eleventh Circuit, there is no "clearly established Federal law, as determined by the Supreme Court" for purposes of 28 U.S.C. § 2254(d)(1) that establishes presumptive bias and requires automatic recusal of a judge under the Due Process Clause in cases of a mere appearance of judicial bias alone. *See, e.g., Davis v. Jones*, 506 F.3d 1325, 1333 (11th Cir.2007)(no due process violation where petitioner claims only an appearance of partiality and not actual bias); *Whisenhant v. Allen*, 556 F.3d 1198, 1209 (11th Cir.2009)(we have held that "there is no Supreme Court decision clearly establishing that an appearance of bias or partiality, where there is no actual bias, violates the Due

Process Clause or any other constitutional provision."(citation omitted)). Additionally, the postconviction court found that Mr. Hill had discussed this matter with Petitioner, and Petitioner expressed no problem with Judge Bell presiding over the case. Mr. Hill testified at the evidentiary hearing that he recalled speaking with Petitioner about the possibility of recusal and Petitioner had no problem with Judge Bell sitting on the case. EH Vol. I at 194-96. Mr. Hill also testified:

> I did not feel and still don't feel that Judge Bell was–would have been prejudicial in any way, and based on the relative–in my understanding and recollection was that he did not have any direct relationship with Henry homes other than having conducted some closings for them at some point in the past, and I did not feel, and knowing the judge, that that would have any bearing on the case. I know that Mr. Grim and I discussed it. I asked him what his position was, whether he had any problem with it and my recollection is that [he did] not, so based on that, we did not ask the judge to recuse himself.

*Id*. at 194-95.

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

C.    Counsel's comments regarding lesser included offenses

Petitioner alleges that his trial counsel breached the attorney-client privilege and provided ineffective assistance of counsel when he advised the court prior to trial that Petitioner had instructed him not to argue for any lesser included charges. *See* doc. 1 at 86.

1.    State Court Proceedings

Petitioner raised this claim in his motion for postconviction relief, and the postconviction court denied the claim.  The Florida Supreme Court affirmed, holding as follows:

> The trial court concluded that Grim failed to establish either *Strickland* prong because he instructed trial counsel not to argue lesser included offenses. We agree.
>
> Before beginning jury selection, trial counsel gave the trial judge a document indicating that Grim wished to waive the presentation of penalty-phase mitigation. The trial court then conducted a *Koon* inquiry. After inquiring of Grim and Rollo, the trial judge asked Hill if he concurred. Hill responded that it had always been Grim's position that he did not wish to present mitigation and, if found guilty, Grim wanted the death penalty. In this context, Hill also informed the trial court that Grim did not want counsel to argue lesser included charges. Grim himself confirmed that he did not want counsel to argue for second-degree murder because he preferred a death sentence to a lengthy prison term.
>
> Before closing argument, Hill reiterated Grim's wishes. The trial court questioned Grim extensively, again confirming that he did not want to argue lesser included offenses; that he understood what the lesser included offenses were; that he understood the jury would be given instructions on lesser included offenses because the State requested them, *see State v. Johnson*, 601 So.2d 219, 220 (Fla.1992); that he made the decision himself against the advice of counsel; that he understood that if found guilty it would be life or death; and that he understood that it was not simply his decision as to whether death was the appropriate penalty. Hill testified at the evidentiary hearing that Grim "did not want me to argue for anything other than not guilty, no lesser includeds," and Hill advised the trial court of Grim's wishes to be sure it was on the record.
>
> We agree with the trial court that Grim has failed to establish deficient performance or prejudice. The record is clear that Grim instructed counsel not to argue for lesser included offenses. Grim was present when counsel informed the trial court as much and actually confirmed his wishes. In this context, counsel's statements informing the trial court of Grim's instructions were reasonable and certainly do not rise to a level "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687, 104

S. Ct. 2052. Further, the statements were made outside of the presence of the jury--the guilt-phase decisionmaker. The jury was instructed on, and the verdict form included, lesser included offenses. Therefore, even if we were to find that counsel should have refrained from providing this information to the trial court, it does not undermine our confidence in the outcome of the proceeding. We affirm the trial court's denial of this claim.

*Grim II*, 971 So.2d at 97.

2.      Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

3.      Federal Review of Claim

This court's review of this claim is confined to determining whether the state court's decision was an unreasonable application of clearly established federal law. While Petitioner has cited *Strickland* in his petition, he had not pointed to any Supreme Court case with facts materially indistinguishable from his own, requiring a different result.

Prior to jury selection, defense counsel presented the court with a form signed by Petitioner waiving the presentation of penalty phase mitigation evidence, T. Vol I at 9, and stated the following:

. . . I've also discussed with Mr. Grim arguments in terms of lesser included charges such as second degree murder. Mr. Grim, again, has indicated to me that he did not want me to stress or argue to the jury, second degree murder in this particular case.

He basically has informed me that he wants me to even essentially argue somewhat of a all-or-nothing defense, basically that he is not guilty, but not to argue to the jury a lesser charge.

And so--and that, Judge, I think all this stems from his wish, again, if he were to be found guilty even of a lesser charge, is very aware more than likely, he still would get life imprisonment. I think that's the basis for his request that I not do that or--and I have indicated to him that during voir dire, that I would not mention those. I would not again go into them in the depth that I would if we were going to be arguing those to the jury, and he

is indicating that, again, he did not wish me to argue either in closing argument or at any time any lesser charge.

*Id*. at 21-22.  The court then asked Petitioner, "Is it also your desire that your counsel not argue for second degree murder which is a lesser included offense?" *Id*. at 29. Petitioner answered, "Yes."  The court continued, "Is this because you believe that if you were convicted of that, that that would result in, in effect, life imprisonment?" Petitioner responded, "Yes, sir."  *Id*.

Before closing argument, Petitioner again expressed his desire for his counsel not to argue lesser included offenses to the jury, specifically second-degree murder. T. Vol. IV at 735-41. The court informed Petitioner that it was going to include on the jury verdict form the charges of first-degree murder, second-degree murder and manslaughter because the State requested them. *Id*. at 737.  Petitioner affirmed several times that he had discussed the issue extensively with his counsel and that he was taking a position contrary to his counsel's advice.  The court summarized the discussion by asking, "And so it is your decision to go against the advice of Counsel and direct your Counsel not to argue the lesser included offenses in Count I, which is the charge of murder?" *Id.* at 739-40.  Petitioner answered, "Yes." *Id*. at 740. The court then found that Petitioner was competent, and his decision was "freely, voluntarily, and knowingly made."  *Id*. at 741.

At the evidentiary hearing Mr. Hill testified, "Mr. Grim specifically told me that he did not want me to argue for anything other than not guilty, no lesser includeds.  And we discussed that, and we discussed what they were, what the consequences of each would be, and he did not want me to argue for any lesser includeds."  EH Vol. I at 196-97.  Mr. Hill testified that he put this decision on the record "because it's unusual for somebody to make that kind of request, and I wanted to be sure that it was on the record that Mr. Grim had asked me  not to do that."  *Id*. at 198.  Mr. Hill acknowledged that he was thinking about the possible future collateral appeal and wanted the record to reflect his client's wishes "because of the fact that Mr. Grim had specific wishes and was very adamant and despite conversations over and over again with counsel,

refused to change his mind or alter anything that he had requested, I felt a need especially where lesser includeds were concerned to put that on the record." *Id.* at 199.

The state court found the record clear that Grim instructed counsel not to argue for lesser included offenses and confirmed this position to the trial court. Because counsel acted consistent with Petitioner's instructions, Petitioner cannot now complain about counsel's performance. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions"). As with the discussion *supra* regarding Petitioner's complaint that counsel had failed to present a viable mental health defense, in this instance Petitioner was also adamant that his defense employ an all-or-nothing strategy wherein he either walks free or receives a death sentence. This position is consistent with his wishes regarding the lesser included offenses. A defendant's instructions may limit the scope of counsel's duty to investigate a particular defense or strategy. *See id.*

The record in this case demonstrates that counsel advised Petitioner it was in his best interest for counsel to argue lesser included offenses, and Petitioner steadfastly refused this advice. Petitioner has not challenged the state court's findings on this issue. The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

D.     Failure to challenge State's case

Petitioner contends that his counsel failed to challenge certain evidence and failed to present a reasonable doubt defense.  Specifically, he alleges that his counsel: (a) failed to challenge Cynthia Wells's purported identification of him on the Pensacola Bay Bridge; (b) failed to argue that the surveillance tape showed the entry and exit points of the bridge and his car was never seen in the bait shop parking lot or entering and exiting the bridge; c) failed to argue that Ms. Campbell was not wearing socks when she entered his home, but was wearing them at the time her body was found; and (d) failed to point out that there were two sets of tire tracks going into his backyard. Doc. 1 at 89-95.

1.     State Court Proceedings

Petitioner raised this claim in his motion for postconviction relief and the postconviction court denied the claim.  The Florida Supreme Court affirmed, holding as follows:

a. Wells's Identification

Grim claims counsel was ineffective for failing to suggest that Cynthia Wells misidentified him, specifically, by failing to point out that Wells indicated he was wearing a shirt, while officers who had contact with Grim that morning indicated he was shirtless. The trial court properly rejected this claim.

Wells did testify that Grim was wearing a light-colored shirt when she saw him on the fishing bridge. Officers who responded to the victim's home the morning of the murder indicated that Grim was not wearing a shirt. Rodgers also testified Grim was not wearing a shirt when he entered the bait shop. However, contrary to Grim's suggestion, trial counsel *did* cross-examine Wells as to her ability to identify Grim, asking her, among other things, to describe the shirt Grim was wearing. Further, he questioned Wells's identification of Grim in closing argument, specifically pointing out that the surveillance tape from the bait shop showed Grim without a shirt, while Wells testified he was wearing one. An argument about whether Grim was wearing a shirt when he encountered officers earlier in the day would add little. *See Brown v. State*, 846 So.2d 1114, 1121 (Fla.2003) (finding arguments that counsel should have

cross-examined or more strenuously examined on certain issues to be "essentially a hindsight analysis"). Therefore, Grim's claim fails the first *Strickland* prong by failing to identify an error or omission, much less a serious error omission, committed by counsel.

### b. Surveillance Tape

Grim next claims trial counsel rendered ineffective assistance by failing to point out that the bait shop surveillance tape shows Grim entering and exiting the store on foot and that it does not show his car in the parking lot or entering or exiting the bridge. He suggests this undermines Wells's identification and the theory that Grim drove his car onto the bridge with Campbell's body in the trunk and disposed of the body in the bay. The trial court concluded that Grim failed to establish prejudice because, as Hill testified, several witnesses placed Grim on the pier and the surveillance tape clearly showed him in the bait shop.FN7 We agree that Grim cannot establish prejudice. The surveillance tape placed Grim in the bait shop shortly after 2 p.m. on the afternoon of the murder. Rodgers likewise placed Grim in the bait shop, and Wells placed Grim and his car on the fishing bridge early that same afternoon. A fisherman hooked the victim's body in the bay at around 3:30 p.m. Blood with female DNA was found in the trunk of Grim's car. Given this evidence, and the large amount of evidence otherwise linking Grim to the victim, Grim has not identified anything related to the surveillance tape that undermines our confidence in the outcome of the proceeding.

> FN7. Hill's testimony at the evidentiary hearing was that "more than one" witness saw Grim at the pier. At trial, two witnesses placed Grim in the area.

### c. Victim's Socks

Grim claims counsel was ineffective for failing to point out that Deputy Lynch, the officer who responded to the victim's home early in the morning regarding her call of a disturbance, indicated Campbell was not wearing socks, but her body was found with socks. The record does not support this claim. Lynch testified at trial that the victim was not wearing *shoes* when he responded to her home on the morning of the murder, but there was no mention of *socks*. Nonetheless, whether Campbell was absent socks when Lynch left the scene, but wearing socks when her body was found is immaterial. We fail to see the relevance of the presence or absence of socks. Further, when Lynch left Campbell's home, Campbell

was still on her porch. Even assuming there was some indication the victim was not then wearing socks, it does not mean she remained barefoot when she left to have coffee with Grim. Given this, all of the evidence connecting the victim to Grim's home, and the lack of evidence of a struggle in the victim's home, Grim has not established that counsel acted unreasonably or identified anything that undermines confidence in the outcome of the proceeding. For these reasons, we reject this claim.

### d. Tire Tracks

Grim claims trial counsel was ineffective for failing to point out that Deputy McCauley's report indicated that there were two sets of tire tracks in Grim's backyard. Grim claims this information would place doubt on his guilt and lend credence to the defense theory that the crime scene was unsecured. At the evidentiary hearing, Hill testified that he vaguely remembered that there were two sets of tracks, but given the other evidence in the case, he did not think it was significant. The trial court rejected this claim, concluding trial counsel made a sound strategic decision. We agree.

Pointing out that there were two sets of tire tracks in Grim's backyard would not lend credence to the theory that the crime scene was left unsecured. The unsecured crime scene theory was that there was a period between the time all of the officers initially left the scene and the time officers arrived to secure the scene after the body was discovered. McCauley observed the two sets of tracks upon the initial investigation of Grim's vehicle by Deputy Rutherford-before Grim left the scene in his vehicle, before the officers left the scene, and before the victim's body was recovered. Therefore, the report of two sets of tracks adds nothing to the unsecure crime scene theory, and trial counsel made a reasonable strategic decision not to raise the issue at trial. *See Brown*, 846 So.2d at 1125 ("[T]his Court will not second-guess counsel's strategic decisions on collateral attack.").

*Grim II*, 971 So.2d at 98-99.

### 2. Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

3.      **Federal Review of Claim**

The Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to Petitioner's claims. *Grim II,* 971 So. 2d at 94. The court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

With regard to Ms. Wells's identification of Petitioner on the bay bridge, the record reflects that Cynthia Wells worked with Petitioner at Daws Manufacturing for approximately two to three months and also socialized with him during this time. T. Vol. III at 459. On July 27, 1998, Ms. Wells was driving across the three mile bay bridge between Pensacola and Gulf Breeze and noticed Petitioner on the Pensacola side of the fishing bridge. *Id*. at 461. She testified that he was walking beside his car and was wearing a light colored shirt, maybe very light tan, and bluejean shorts. *Id*. at 461-62. She also recognized his car. *Id*. at 461. On cross-examination, Mr. Hill asked Ms. Wells to describe the shirt, and she responded that it was a white or very light tan short-sleeved t-shirt. *Id*. at 465. Mr. Hill asked whether Petitioner had shoes on (she did not know); whether she saw his dogs (she did not see them); and had Ms. Wells acknowledge that she was driving at the time and did not stop to observe Petitioner. *Id*. at 465-66. Mr. Hill also brought out that Ms. Wells had not worked with Petitioner for a year and a half prior to seeing him on this bridge. *Id*. at 467. Mr. Hill testified at the evidentiary hearing that he did not recall all of the specifics with regard to evidence regarding Petitioner's shirt, but he stated, "I do recall the video in which it was plainly Mr. Grim without a shirt on at the pier," and the video was date and time stamped. EH Vol. I at 209. He also testified that he had cross-examined the witnesses with respect to their ability to identify Petitioner, but he felt that the video evidence was more damaging than the testimony of the eyewitnesses. *Id*. at 210. With regard to the other evidence at issue, Mr. Hill testified at the evidentiary hearing that in his opinion the

issue of the victim's socks was not significant. *Id.* at 216. Finally, as to the tire tracks, Mr. Hill testified, "I recall vaguely the notion that there were two sets of tracks, but based on the other evidence in the case, I didn't feel it was significant." *Id.* at 214.

Petitioner has not demonstrated that his counsel's decisions with regard to the evidence at issue were deficient. Reviewing courts must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (quotation marks omitted). The purpose of ineffectiveness review is not to grade counsel's performance. *See White v. Singletary*, 972 F.2d 1218, 1221 (11th Cir.1992) ( "We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately."); *Chandler v. United States*, 218 F.3d 1305,1313 (11th Cir. 2000)("Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'" (citation omitted)). A petitioner must establish that no competent counsel would have taken the action that his counsel did take. *See White v. Singletary, supra*, 972 F.2d at 1220 ("The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial."); *Provenzano v. Singletary*, 148 F.3d 1327, 1332 (11th Cir.1998) (noting that counsel's conduct is unreasonable only if petitioner shows "that no competent counsel would have made such a choice").

Petitioner has fallen far short of meeting the performance prong of *Strickland* with regard to this claim. The Florida Supreme Court found that none of the alleged

errors undermined its confidence in the outcome of Petitioner's trial.  Petitioner has not demonstrated that any of the alleged errors were sufficiently significant to meet either prong of *Strickland*.  The state court's factual findings are supported by the record and must be given deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence.  Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to  that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent.  Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

Ground IV:   Ineffective Assistance of Counsel/Penalty Phase

    A.    Failure to present available mitigating evidence

Petitioner contends that his trial counsel, including specially appointed counsel Spiro Kypreos, failed to fully investigate the extent of his drug use and other nonstatutory mitigation evidence and failed to fully advise him and the court of the mitigation evidence that could have been presented.  Petitioner claims that his waiver of mitigation was invalid because he was not informed of the available mitigation evidence that could have been presented.  Petitioner likens his case to *Wiggins v. Smith*, *supra*, and argues that had a mitigation case been adequately investigated, he would not have waived the presentation of this evidence, and the outcome of his trial would have been different.  Doc. 1 at 96-108.

    1.    State Court Proceedings

Petitioner raised this claim in his motion for postconviction relief and the postconviction court denied the claim.  The Florida Supreme Court affirmed, holding as follows:

    " 'When evaluating claims that counsel was ineffective for failing to investigate or present mitigating evidence, this Court has phrased the

defendant's burden as showing that counsel's ineffectiveness 'deprived the defendant of a reliable penalty phase proceeding.' " ' *Henry [v. State]*, 937 So.2d [563] at 569 [Fla. 2006] (quoting *Asay v. State*, 769 So.2d 974, 985 (Fla.2000) (quoting *Rutherford v. State*, 727 So.2d 216, 223 (Fla.1998))). "However, along with examining what evidence was not investigated and presented, we also look at counsel's reasons for not doing so." *Sliney v. State*, 944 So.2d 270, 281-82 (Fla.2006). Defendants have the right to waive presentation of mitigating evidence. *E.g., Koon*, 619 So.2d at 249 ("We have repeatedly recognized the right of a competent defendant to waive presentation of mitigating evidence."). However, as we recognized in *Koon*, 619 So.2d at 250:

> When a defendant, against his counsel's advice, refuses to permit the presentation of mitigating evidence in the penalty phase, counsel must inform the court on the record of the defendant's decision. Counsel must indicate whether, based on his investigation, he reasonably believes there to be mitigating evidence that could be presented and what the evidence would be. The court should then require the defendant to confirm on the record that his counsel has discussed these matters with him, and despite counsel's recommendation, he wishes to waive presentation of penalty phase evidence.

Here, upon receiving Grim's notice of waiver of mitigation, the trial court conducted a *Koon* inquiry. Following the verdict, the court conducted another inquiry, incorporating the previous proceeding. Rollo proffered the following mitigation evidence: testimony and a report from Larson that two statutory mental mitigators applied; testimony from Larson as to nonstatutory mitigation, including various aspects of Grim's childhood; testimony from two of Grim's supervisors as to his good employment history; testimony from Grim's mother, sister, and stepfather as to his "chaotic childhood," that he was a good student, and that he was loving and caring; and testimony as to stress in Grim's life at the time related to his marriage. Grim confirmed that he understood the process and had discussed aggravators and mitigators with counsel, that they had thoroughly discussed his case with him, that he was satisfied with their services, and that the decision to waive mitigation was his alone against the advice of counsel. He further indicated that "Mr. Rollo has performed above and beyond his duties" and "I'm perfectly happy with his performance." The trial court found that Grim knowingly and voluntarily

waived his right to present mitigation and that defense counsel complied with the duties to investigate and have witnesses ready to testify.

We have recognized that a defendant's waiver of his right to present mitigation does not relieve trial counsel of the duty to investigate and ensure that the defendant's decision is fully informed. *See, e.g., State v. Lewis*, 838 So.2d 1102, 1113 (Fla.2002) ("Although a defendant may waive mitigation, he cannot do so blindly; counsel must first investigate all avenues and advise the defendant so that the defendant reasonably understands what is being waived and its ramifications and hence is able to make an informed, intelligent decision."). However, unlike other cases where we have concluded that counsel's failure to adequately investigate mitigation rendered the defendant's waiver invalid, *e.g., Lewis*, 838 So.2d at 1113-14, the record here does not support a claim of failure to investigate. Rollo testified that, despite his client's wishes, he recognized he still had a duty to develop mitigation. He did not latch onto Grim's desire not to present mitigation, but instead, repeatedly tried to dissuade him. Rollo's proffer reveals he uncovered a substantial amount of mitigation. Further, he filed a motion to appoint Dr. Larson as a mental health expert several months before trial and contacted Grim's mother, sister, stepfather, and two supervisors.

In addition, Grim has not pointed to substantial undiscovered mitigating evidence. *See Lewis*, 838 So.2d at 1114. He points only to the alleged failure to fully investigate the effect of his drug and alcohol use on his explosive disorder. However, Rollo testified he was aware of Grim's drug use and explosive disorder, but did not specifically seek an expert as to the effect of drug use on Grim's mental state based on Grim's desire not to present any mitigation evidence. *See Henry*, 937 So.2d at 571 (rejecting an ineffective assistance claim related to the failure to pursue and present evidence of drug addiction where "trial counsel met with stiff resistance from his client at every turn regarding any efforts to piece together a drug defense for either the guilt phase or for mitigation"); *Brown v. State*, 894 So.2d 137, 146 (Fla.2004) ("An attorney will not be deemed ineffective for honoring his client's wishes."). Further, Rollo proffered that Larson would establish two statutory mental mitigators, but Grim objected to presentation from Larson in any form. Grim would not even allow Rollo to proffer specifics as to Larson's findings on these mitigators, asserting attorney-client privilege. There is no indication that additional information from another expert would have altered Grim's decision not to present mitigation where, with full knowledge that such information could

**establish statutory mental mitigation, he refused to permit presentation in this regard from Larson.**

**For all of these reasons, the trial court correctly concluded that trial counsel conducted a reasonable investigation in light of Grim's decision to waive mitigation, and trial counsel's actions did not deny Grim a reliable penalty phase.** *See Henry***, 937 So.2d at 573;** *Reed v. State***, 875 So.2d 415, 436-37 (Fla.2004);** *Waterhouse***, 792 So.2d at 1183-84;** *Koon***, 619 So.2d at 250.**

*Grim II*, 971 So.2d at 99-101.

### 2. Clearly Established Supreme Court Law

The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

### 3. Federal Review of Claim

This claim dovetails with Petitioner's claim regarding the failure to present a viable mental health defense discussed *supra* at 44-50. Mr. Rollo testified at the evidentiary hearing that Petitioner had voiced his intention to waive penalty phase mitigation prior to his appointment on the case. Mr. Rollo had previously handled three death penalty cases. EH Vol. II at 7. With regard to the decision to waive presentation of a mitigation case, Mr. Rollo testified as follows:

> This is my first death penalty case where I had an actual volunteer for the death penalty, so I was warned of that from the very beginning, as I mentioned, so it was kind of an unusual set of circumstances to accept appointment in a case where the captain of the ship, as he's been described, the client, wanted a result that just goes against the grain of everything you've been trained in law school and in the practice of law to prevent, which is the ultimate sanction, so it's kind of unusual.
>
> So I did some research. The public defender's file contained a good law review article about what to do when faced with the volunteer client who wants to sit in the chair or lay down on the gurney, so I did some review of that, counseled with Mr. Grim, discussed with him from every point of view, from a legal point of view, from a counselor point of view, from an advisor's point of view and from a human point of view, how I thought that it was ill-advised given the circumstances he was in to pursue what he

wanted to pursue, and I am not trying to be long winded, but I'm trying to give you the background of our–how it started off.

In first consultation with Mr. Grim and in every consultation thereafter he reconfirmed, reiterated that that was his express desire not to seek any mitigation. He didn't want his family brought in to the matter, didn't want anything dredged up from the past, so that was the basis why I did not hire an investigator.

*Id*. at 10-11. During the *Koon* hearing,[16] Mr. Hill also testified with regard to Petitioner's waiver of evidence:

I think I may have been in the case a little bit earlier than Mr. Rollo, but I could inform the Court without hesitation that in all of my conversations, from the very first time that I talked with Mr. Grim, he's been very adamant about his position in terms of the death penalty.

There's never been any waiver. He indicated that if he were to be found guilty, it was his wish that the death penalty be imposed, that he waive any type of penalty phase or anything of that nature.

And I can tell the Court that Mr. Grim is very intelligent. He's very aware of this case, the evidence in this case. He's always been up to date, up to speed on everything that has gone on. He knows the case as well as I do in terms of what the witnesses are going to say and basically the entire case.

And he has never, ever, at any time, and we have talked about it on numerous occasions about that, and he has indicated to me always the same, that he did not wish to have mitigation, that he wanted basically for the Court to impose a death sentence if he were to be found guilty.

T. Vol. I at 21.

The record supports the state court's determination that Petitioner waived his right to present mitigating evidence after having been fully advised of his rights. During the *Koon* hearing, Petitioner orally and in writing explicitly waived the presentation of a mitigation case. *See* T. Vol. I at 11. The trial court then explained the

---

[16] *Koon v. Dugger*, 619 So.2d 246 (Fla. 1993).

penalty phase procedures, and Petitioner repeatedly affirmed that he understood the

aggravating and mitigating circumstances and wanted to waive a mitigation case:

> [Court]: And you understand that in that mitigation you could call any witnesses that you want to from psychologists, psychiatrists, former employers or whatever to present anything that you want, to try to offset the imposition of the death penalty.  Do you understand that?
>
> [Grim]: Yes, I understand.
>
> [Court]: And you have discussed that with both of your attorneys, the right to call any and all family members that would speak about you and your life and your background and anything that would be favorable to the jury in making its decision.  You discussed that with your attorneys?
>
> [Grim]: Yes.
>
> [Court]: And you understand that because of the presentation of this information, I don't know what the aggravators are in the case, and you discussed the potential aggravators with your attorneys?
>
> [Grim]: Yes, I have.
>
> [Court]: By the presentation of this evidence, that the jury could very well, even if you were found guilty of murder as charged, could find that mitigation outweighs the aggravating and recommends life.  Do you understand that?
>
> [Grim]: Yes, sir.
>
> [Court]: Even if they were to recommend death, I could do a separate proceeding and say, no, that's not appropriate in this case, and life is appropriate.  Did you understand that?
>
> [Grim]:  Yes.
>
> [Court]: Have you had plenty of time to discuss this with both of your attorneys?
>
> [Grim]: Yes.
>
> [Court]: And are you satisfied with them and their services?

[Grim]: Yes, I am.

[Court]: Have they been out to the jail and discussed with you your case and all the evidence as Mr. Hill suggested?

[Grim]: Yes, they have.

[Court]: Have they–is there anyone that they haven't talked to or anyone that you think is necessary to prepare for this case?

[Grim]: No, sir.

[Court]: It is your decision and your decision alone to instruct your lawyers not to call family members, other employers, not to present mitigation evidence if you are found guilty?

[Grim]: Yes, it is.

[Court]: And is it still your desire to waive the presentation of mitigation evidence to the jury if they find you guilty of first degree premeditating or felony murder?

[Grim]: Yes, it is.

*Id.* at 27-29.  The court also inquired into Petitioner's competency and found that Petitioner "freely, voluntarily and knowingly made the decision to waive the presentation to the jury of mitigation evidence in this case."  *Id.* at 33.

The record also supports the state court's determination that Petitioner's counsel conducted a reasonable investigation into potential mitigation evidence and proffered a substantial amount of mitigation to the court.  During the *Koon* hearing, Mr. Rollo proffered to the court the mitigating evidence that he would have presented absent Petitioner's waiver.  Mr. Rollo would have presented Dr. James Larson, a forensic psychologist, who evaluated Petitioner and found two statutory mitigating circumstances: that the offense occurred while Petitioner was under the influence of extreme emotional disturbance and that Petitioner's capacity to conform his conduct to the requirements of the law was substantially impaired at the time of the offense. *Id.* at 13.  When asked if Petitioner was aware of these mitigators, Mr. Rollo affirmed that

he had discussed them with Petitioner who was "intelligent, aware, oriented and knew exactly what we were talking about" during their discussion. *Id*. at 14-15.

Mr. Rollo also stated that he would have presented various nonstatutory mitigation, including Petitioner's employment history (Mr. Rollo deposed two employees at the company where Petitioner worked who would have provided favorable testimony); his family background and childhood (Mr. Rollo deposed Petitioner's mother, sister and stepfather who described a chaotic childhood and a distant father); and the various stressors associated with Petitioner's marriage which may have coalesced into the statutory mitigators mentioned. S*ee id*. At 16-19.

On cross-examination during the evidentiary hearing, Mr. Rollo testified that Petitioner became angry when he learned that he had contacted his family members about possible mitigating evidence. EH Vol. II at 33. With respect to good behavior in prison mitigation, Mr. Rollo stated that it is usually presented because it is appealing to a jury, although he does not believe that a court generally accords it any weight. *Id*. at 22. Mr. Rollo also testified that he became aware that Petitioner was using prescription drugs and illicit drugs and/or alcohol and employed Dr. Larson for the specific purpose of finding potential psychiatric mitigation. *Id*. at 12-13. Dr. Larson in fact found that two statutory mitigators existed. Mr. Rollo had also recently used a neuropharmacology expert in a previous capital case which he worked on with Mr. Hill, so he was familiar with the use of this type of mitigation witness. *Id*. at 19-20. When asked on redirect examination why he did not consult a neuropharmacologist, Mr. Rollo responded:

> [I]f you're asking me was that developed secondarily as a result of Dr. Larson or should have been, I can only tell you that, again, my recollection is that Butch didn't want to go down that road–Mr. Grim, that is–and, in fact, when I identified the statutory, nonstatutory mitigating circumstances, he initialed my–my presentation and he didn't even want me to provide anything that Dr. Larson had worked up, any analysis, any assessment of him, Butch Grim, he didn't want that presented and I have his initials on the piece of paper.

> Do, you know, really it leads me to believe, and that's why my recollection is refreshed about this issue about the secondary expert, that he didn't want Larson's analysis of him or his psychological assessment of him presented in mitigation, and that kind of weaves back into the guilt phase and they did really want to go down that road in the guilt phase. He wanted, some-other-person-did-the-crime defense presented, and that's my best answer.

*Id*. at 43-44.

Dr. Larson testified during the evidentiary hearing that Petitioner was willing to be evaluated despite his feelings about a mitigation case. Dr. Larson explained as follows:

> [Petitioner] was superficially cooperative. I want to clarify that. He was cooperative in the sense that he answered my questions. He was not enthusiastic about this evaluation. He made it very clear that he wanted the defense based on reasonable doubt, and he understood my task in this case was to serve as a mitigation expert or to look for possible psychological mitigation, and he made it very clear that if he was found guilty of first degree murder, he didn't want any mitigation put on.
>
> In fact, the only thing, he had been in prison before and didn't want to live the rest of his life in prison and serve a long time in prison and so my sense was that sometimes he gave abbreviated answers. He didn't give full details.
>
> My sense was there was a lot more richness in terms of his depravations in childhood and dysfunctional family and so forth so he just answered questions basically succinctly, but without spontaneous elaboration with the exception he spontaneously elaborated that he was not interested in any mitigation and knew that's why I was there.

EH Vol. I at 23-24. Dr. Larson believed that Petitioner had an adequate understanding of what mitigation was. *Id*. at 24. When asked whether Petitioner's use of prescribed drugs and alcohol was discussed with Petitioner's attorneys, Dr. Larson testified that there were discussions about his medications, particularly the possibility of a Prozac defense. *Id*. at 31. However, Dr. Larson testified that Petitioner was not interested in this kind of defense because it would have required him to admit that he committed the crime "and he was only interested in being found not guilty." *Id*. at 32. Dr. Larson and

the defense team also explored a possible insanity defense, but again Petitioner was only interested in a defense in which he was exonerated. *Id.* at 33.

Additionally, although Petitioner did not cooperate with Spiro Kypreos, the special counsel appointed to provide the court with information regarding possible existing mitigators, a mitigation case was presented to the court.[17] During the *Spencer* hearing[18] conducted after the jury reached its advisory sentence, Petitioner again expressed his desire to waive the presentation of mitigating evidence. T. Vol. III at 551-54. Petitioner objected to the presentation of any evidence related to Dr. Larson because he did not waive the doctor-patient privilege. *Id.* at 559. The court denied the objection, and Mr. Kypreos presented mitigation witnesses over Petitioner's objection. *Id.* at 561. During the *Spencer* hearing, Mr. Kypreos pointed out that Petitioner would not cooperate with him, which naturally disadvantaged his presentation of mitigating evidence. *See id.* at 568, 570. Mr. Kypreos then presented the following witnesses: Robert Schenke (shift superintendent at Daws Manufacturing); David Daws, Jr. (plant manager of Daws Manufacturing); and Elaine Guy (Petitioner's sister). *See id.* 574-89. Mr. Kypreos also submitted into evidence the depositions taken the case, Dr. Larson's psychiatric evaluation of Petitioner and a presentence investigation prepared in a previous conviction from 1982. He also argued that the case was not one involving the most serious aggravators: cold, calculated and premeditated or heinous, atrocious or cruel. *Id.* at 592-96. Mr. Kypreos reviewed the details of Petitioner's 1982 conviction in an effort to provide an explanation for his violent behavior; addressed the components of intermittent explosive disorder; reviewed Petitioner's childhood, including that his father was an alcoholic who had physically abused him; mentioned

---

[17]  Spiro Kypreos was appointed by the court as special counsel to investigate possible mitigating evidence. He had been in practice since 1971, practicing primarily criminal law since 1989. T. Vol. III at 571. Mr. Kypreos had been involved in numerous criminal jury trials and appeals and was involved in three capital cases prior to his appointment in this case. *Id.* at 572.

[18]  *Spencer v. State*, 691 So.2d 1062 (Fla. 1996).

Petitioner's time in the U.S. Navy; and addressed some of the marital stressors at play. *See id.* at 597-614.

Petitioner has not rebutted the factual findings made by the state court by clear and convincing evidence. Petitioner has not demonstrated that his waiver of the presentation of a mitigation case was not knowing nor that he was not fully advised of the potential mitigation that existed. Additionally, most of the nonstatutory mitigation which Petitioner now claims should have been presented to the court was presented, albeit in an abbreviated fashion due to Petitioner's unwillingness to cooperate or authorize that this evidence be presented. *Cf. Wiggins, supra.* Given Petitioner's unwavering direction to his counsel not to present a mitigation case, Petitioner is unable to demonstrate ineffective assistance of counsel. *See Schriro v. Landrigan*, *supra.* *See also Cummings v. Sec'y, Dep.'t of Corrs.*, 588 F.3d 1331, 1360-61 (11th Cir. 2009)(state court determination could not be disturbed by federal court on habeas review, where petitioner had explicitly instructed attorney not to investigate or present mitigating evidence, where attorney had not blindly followed these instructions but explained benefits of such evidence, enlisted trial judge's assistance in advising petitioner of importance of such evidence, and obtained psychiatric evaluation of his competence to reject presentation of any evidence that could have effect of mitigating death sentence to one of life in prison).

The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly

established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

B.    Failure to properly advise Petitioner as to waiver of jury sentencing recommendation

Petitioner contends that his counsel incorrectly advised him that Florida law did not allow him to waive the right to a penalty phase jury advisory sentencing. He alleges that this incorrect assessment of Florida law caused the trial court to accord great weight to the sentencing jury's unanimous recommendation of death and, coupled with counsel's failure to present a case in mitigation, resulted in prejudice. Doc. 1 at 108-112.

1.    State Court Proceedings

Petitioner raised this claim in his motion for postconviction relief and the postconviction court denied the claim. The Florida Supreme Court affirmed, holding as follows:

> A defendant may waive the advisory jury in the penalty phase of a capital case, provided the waiver is voluntary and intelligent. *E.g., Valle v. Moore*, 837 So.2d 905, 908 (Fla.2002). However, "even when a capital defendant makes a voluntary and intelligent waiver of the advisory jury's recommendation, the trial judge 'may in his or her discretion either require an advisory jury recommendation, or may proceed to sentence the defendant without such an advisory jury recommendation.' " *Muhammad v. State*, 782 So.2d 343, 361 (Fla.2001) (quoting *State v. Carr*, 336 So.2d 358, 359 (Fla.1976)). The record confirms that Rollo was uncertain as to whether the jury recommendation could be waived. Nonetheless, it is unnecessary to address *Strickland*'s performance prong because this claim fails the prejudice prong. *See Jones*, 928 So.2d at 1189.
>
> First, the trial judge expressly and unequivocally informed Grim of his right to waive the jury advisory sentencing. Second, Grim himself indicated on the record that he did not care whether the court obtained a jury recommendation, and the sentencing order confirms as much: "The Defendant made it clear he would waive presentation before a jury as provided in section 921.141(1). He left the decision of whether to obtain an advisory sentence to the Court, but was adamant that no mitigation be presented or argued." Third, the sentencing order states that "had the Defendant sought to waive the jury recommendation, this Court probably

would have exercised its discretion and rejected the waiver." Finally, the trial judge recognized that the jury did not have the benefit of mitigating evidence and independently weighed the aggravating and mitigating circumstances. *See Grim*, 841 So.2d at 461 & n. 4. For these reasons, even if counsel failed to inform Grim of his right to waive the jury recommendation, our confidence in the outcome of the proceeding is not undermined.

*Grim II*, 971 So.2d at 101-02.

  2.  **Clearly Established Supreme Court Law**

  The standard for evaluating claims of ineffective assistance of counsel is set forth *supra*.

  3.  **Federal Review of Claim**

  The Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of counsel and applied those standards to Petitioner's claims. *Grim II,* 971 So. 2d at 94. The court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

  The record supports the state court's determination with regard to this claim. During the *Koon* hearing, the trial court explained the sentencing process and informed Petitioner that the court would engage in its own weighing process as well as taking into consideration the jury's recommendation. The court stated:

> In the penalty phase, all aggravators and mitigating circumstances are presented to the jury, they're argued by counsel, and they make a recommendation to the Court on what penalty should be imposed, and then I do a separate proceeding which we call a *Spencer* hearing where [you] present any evidence that you may want presented or wasn't presented to the jury or otherwise, and I go through my own weighing process, and I consider the jury's recommendation and I go through my own weighing process.
>
> Then and only then, if both of us agree separately that death is appropriate if death is imposed and the preference is for life–and that's

the way our society works now is that the death penalty is only imposed
for the worst of the murder cases.  Do you understand that?

T. Vol. I at 26.   Petitioner answered that he did understand.  *Id.*  The trial court then
advised Petitioner that he had "the absolute right under Florida law and statute to
waive that jury advisory sentencing."  *Id.* at 27. When asked if he understood that,
Petitioner answered, "Yes."  *Id.*  Therefore, Petitioner was advised correctly on the
state of the law regarding a waiver of a jury advisory sentencing, regardless of whether
Mr. Rollo advised him differently.  Furthermore, in its sentencing order the trial court
noted that even if Petitioner had sought to waive a jury recommendation, it "probably
would have exercised its discretion and rejected that waiver."  Sentencing Order, T.
Vol. I at 235.  The court also noted in its sentencing order that it considered and gave
great weight to the jury recommendation, but recognized that the jury did not have
benefit of receiving mitigating evidence.  The court then independently weighed the
aggravating and mitigating circumstances and found that both paths led to the same
conclusion, that the aggravating circumstances outweighed the mitigating ones.  *Id.*
at 237.

Based on the record in this case, Petitioner cannot demonstrate prejudice under
*Strickland*.  Even if defense counsel had properly advised Petitioner as to the state of
the law regarding a waiver of jury advisory sentencing, the trial court indicated that it
probably would not have accepted the waiver.  Additionally, Petitioner was advised on
the matter by the trial court and did not request the waiver.  Finally, even if the trial
court had allowed Petitioner to waive a jury advisory sentencing, the outcome would
have been the same.  The trial court took into consideration the jury's advisory
sentence and engaged in a separate weighing process and found that death was an
appropriate sentence in this case.  Thus, Petitioner's death sentence was not wholly
dependent on the jury's recommendation.

The state court's factual findings are supported by the record and must be given
deference by this court.  Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut
the state court's factual determinations as to this issue with clear and convincing

evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground V:    Conflict of Interest Regarding Specially Appointed Attorney Kypreos**

Petitioner alleges that Mr. Kypreos, although appointed by the court to represent the public interest, was also representing his interests as well. Petitioner contends that Mr. Kypreos's representation of an inmate, Tracy Coffey, who claimed that Petitioner admitted to him in some detail that he had committed the murder and had been interviewed as a possible witness, constituted a conflict of interest which violated his right to effective assistance of counsel by prejudicing Mr. Kypreos's presentation of the mitigation case to the court during the *Spencer* hearing. Doc. 1 at 113-121.

**1.    State Court Proceedings**

Petitioner raised this claim in his motion for postconviction relief and the postconviction court denied the claim. The Florida Supreme Court affirmed, holding as follows:

> Because during the penalty phase Grim refused to present any mitigation evidence, the trial court ordered the preparation of a presentence investigation and appointed Spyro Kypreos as special counsel to investigate and present available mitigation evidence at the *Spencer* hearing. Grim alleges that special counsel was ineffective because of an undisclosed conflict of interest related to Kypreos's representation of Tracy Coffey, an inmate at the same correctional facility where Grim was held awaiting trial. Coffey had been interviewed as a possible witness against Grim after informing the state attorney's office that while in custody Grim had confessed to Campbell's murder. Coffey did not testify at Grim's trial, and the relationship between Coffey and Kypreos was never disclosed to the defense or the trial court. Nevertheless, Grim argues that Kypreos had a conflict of interest that resulted in Kypreos

providing inadequate representation. As explained below, this claim is meritless.

When a defendant waives the presentation of mitigating evidence during the penalty phase, the trial court may appoint special counsel to present it. *Muhammad*, 782 So.2d at 364. As we explained, "[a]ny counsel performing this function . . . [acts] solely as an officer of the court." *Id*. n. 15. Special counsel appointed in this capacity is assigned to represent the public interest and not the defendant. *See Klokoc v. State*, 589 So.2d 219, 220 (Fla. 1991). Because the appointment of special counsel is solely at the discretion of the trial court, and because special counsel solely represents the public interest, no attorney-client relationship is established between special counsel and the defendant. Therefore, a defendant has no basis for claiming that special counsel's presentation of mitigation evidence was ineffective. *Muhammad*, 782 So.2d at 364 n. 15 (recognizing that a defendant who "knowingly and intelligent[ly] waived the presentation of mitigating evidence . . . [is] barred from subsequently claiming that [special] counsel's performance was ineffective in the presentation of mitigating evidence"). Kypreos did not represent Grim. Therefore, Grim cannot challenge the effectiveness of Kypreos's presentation of mitigation evidence, and the trial court properly denied Grim's claim.

*Grim II*, 971 So.2d at 102.

2.     Clearly Established Supreme Court Law

In *Cuyler v. Sullivan*, 446 U.S. 335, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980), the Supreme Court considered a claim of ineffective assistance of counsel in a case where defense counsel represented three codefendants without objection. *Id*. at 337-38. The Court held "[i]n order to establish a violation of the Sixth Amendment, a defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." *Id*. at 348. Subsequently, in *Mickens v. Taylor*, 535 U.S. 162, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002), the Supreme Court rephrased the analysis somewhat and stated an "actual conflict" is what a defendant must establish under *Cuyler* to prove a Sixth Amendment violation. *Id*. at 171, 172 n. 5. The Court defined an actual conflict as (1) a conflict of interest that (2) adversely affected the lawyer's performance. *Id*. "[U]ntil a defendant shows that his counsel

actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance." *Cuyler*, 446 U.S. at 350.

      3.     Federal Review of Claim

While Petitioner argues that the Florida Supreme Court has unreasonably determined that Mr. Kypreos did not represent him, he points to no persuasive facts that rebut this determination, nor has he cited any legal authority to support this contention. *See* doc. 1 at 121. In its order appointing Mr. Kypreos, the trial court noted that Petitioner had waived his right to present mitigating evidence, but noted the Florida Constitution nevertheless imposed upon it the obligation to determine whether death is a proportionate penalty to the crime. The order then states:

> This Court believes that the circumstances of this case dictate the appointment of an independent or special counsel to present mitigating evidence at the *Spencer* hearing. This special counsel will represent the *public interest* in bringing forth mitigating evidence to be considered by the Court. *See Klokac v. State*, 589 So.2d 219 (Fla. 1991); *Lockhart v. State*, 655 So.2d 69 (Fla. 1995); *Farr [v. State*, 656 So.2d 448 (Fla. 1995)].

Order Appointing Special Counsel and Setting *Spencer* and Sentencing Hearings, T. Vol. II at 221 (emphasis in original).

The record supports the state court's determination that Mr. Kypreos did not have an attorney-client relationship with Petitioner. At the evidentiary hearing, Mr. Kypreos testified that as he understood it, he was representing the public interest and not Petitioner. EH Vol. II at 9. He elaborated as follows on direct examination when trying to distinguish between Petitioner's interest and that of the public in this context:

> I thought the public interest and his interest coincided. I thought it was in the public interest that he had the fairest hearing possible, that to the extent I could without the cooperation of a client, with his counsel opposing me, with his counsel not disclosing anything to me, [ ] not what had gone on in the case before really. I think the best I got was some indication of a psychological report, but essentially I felt it was my job to represent him as if he were my client, but I knew I wasn't appointed to represent him.

* * * *

I wouldn't describe our relationship as attorney/client relationship, that my responsibilities were in the sense of attorney/client; but I felt that if I were to fulfill my duty of serving the public interest, it was to in essence serve his interest, whether he wanted it or not. That's what I thought essentially I was supposed to do. I saw it as Mr. Rollo's hands were tied. The Judge felt it was in the public interest that somebody try to advance his interest as best they could. And that's how the public interest would be served.

* * * *

I think by public interest in this context it would be that there's a sense that in a case this serious, a death penalty case, that justice is done, that all the evidence favor[ing] the defendant particularly in the penalty phase that could save his life would be brought to light.

* * * *

I was trying to serve justice by serving his interest. I did not feel that I should treat this as some kind of academic exercise. I felt that it was the same as if I had been appointed to him even if I wasn't. That was my definition of the public interest. Whether that was broader or more narrow than what the Court envisioned, I really don't know; but that's how I saw it.

* * * *

I mean, I saw myself–and you have to understand my reasoning–as analogous to an amicus. In court when somebody files an amicus brief, they're not necessarily doing it on behalf of either party, although their position may certainly favor one party or the other. I felt that it was my duty to protect the public interest. And I felt personally that that interest lay in looking out for his interest. Now, did that make me his retained attorney? Did we have an attorney/client relationship? I did not think so. I did not think we had an attorney/client relationship--

*Id.* at 10-11, 17. Additionally, Mr. Hill testified that Mr. Kypreos was representing the public interest in the case, not Petitioner, so he would not have viewed Mr. Kypreos's representation of Mr. Coffey as a conflict of interest. EH Vol. I at 113-14. Finally, Mr. Rollo testified that "Mr. Grim was opposed to Mr. Kypreos making any presentation of mitigation whatsoever just as he had been with me," and Mr. Rollo did not communicate about the case with Mr. Kypreos because he felt it would compromise his attorney/client relationship with Petitioner. EH Vol. II at 37, 38.

Because Mr. Kypreos did not represent Petitioner, there is no conflict of interest or resulting ineffective assistance of counsel. The state court's factual findings are supported by the record and must be given deference by this court. Petitioner has the burden under 28 U.S.C. § 2254(e)(1) to rebut the state court's factual determinations as to this issue with clear and convincing evidence. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground VI:    Trial Court Erred in Giving Improper Consideration to Jury's Sentencing Recommendation and in Not Presenting Mitigating Evidence to Jury**

Petitioner contends that the trial court should have appointed a special counsel in this case when it learned just prior to trial that Petitioner wished to waive the presentation of a mitigation case. He also contends that this special counsel should have presented a mitigation case before the jury in spite of his waiver because that is the only way the court could properly give weight to the jury's sentencing recommendation. Finally, he alleges that had a mitigation case been presented, the jury may have recommended a life sentence. Petitioner contends that his rights under the Sixth, Eighth and Fourteenth Amendments were violated. Doc. 1 at 122-36.

1.      **State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentence. The Florida Supreme Court denied relief, holding:

In *Muhammad v. State*, 782 So.2d 343 (Fla.), cert. denied, 534 U.S. 836, 122 S. Ct. 87, 151 L. Ed.2d 49 (2001), and cert. denied, 534 U.S. 944, 122 S. Ct. 323, 151 L. Ed.2d 241 (2001), the defendant Muhammad discharged his penalty phase counsel and did not present any mitigating evidence. In its instructions to the penalty phase jury, the trial court stated that "[y]our advisory sentence as to what sentence should be imposed on this Defendant is entitled by Law and will be given great weight by this Court

in determining what sentence to impose in this case." *Id*. at 363 n. 9. Thereafter the jury returned a recommended sentence of death. At the sentencing hearing, the trial court considered mitigating circumstances contained in the presentence investigation report which were not presented to the jury. The trial court imposed a death sentence indicating in its sentencing order that "[t]his Court must give great weight to the jury's sentencing recommendation." *Id*. at 362. This Court reversed for a new penalty phase and found that "the trial court erred when it gave great weight to the jury's recommendation in light of Muhammad's refusal to present mitigating evidence and the failure of the trial court to provide for an alternative means for the jury to be advised of available mitigating evidence." *Id*. at 361-62.

In the present case, the State introduced evidence of aggravating circumstances in the penalty phase; however, Grim did not present any mitigating evidence. During the *Koon* hearing, the trial judge specifically warned Grim that he, as the sentencing judge, must give great weight to any recommendation by the jury. The trial court also instructed the jury that its advisory sentence would be given great weight. Thereafter, the jury returned a recommendation of death.

In its sentencing order the trial court recognized, unlike the trial court in *Muhammad*, that the penalty phase jury did not have the benefit of hearing mitigation:

> First, as a general matter of law, a jury's recommendation of life or death must be given great weight. The jury in this case unanimously recommended death, but it did not have the benefit of receiving mitigating evidence from the Defendant or the benefit of his counsel arguing the evidence and applicable law.

Moreover, the trial judge considered two separate paths in sentencing Grim. In considering the jury's recommendation, the judge recognized and considered the fact that in making its recommendation the jury did not have the benefit of hearing mitigating evidence. The judge therefore independently weighed the aggravating and mitigating circumstances as noted in his sentencing order:

> Thus, in reaching its sentencing decision, this Court has assiduously followed the two separate paths recognized by law. It has duly considered the jury recommendation. But it

has also independently weighed the aggravating and mitigating circumstances. Both paths have led to the same point.

We find this case distinguishable from *Muhammad* and conclude that the trial court properly sentenced Grim despite the lack of mitigation presented for the jury's consideration in the penalty phase.FN4

> FN4. Even though the trial judge in the present case was not required to comply with the procedures enunciated in *Muhammad* due to the fact that Grim's trial was completed before the *Muhammad* case was decided, we commend the trial judge for his insight in handling Grim's waiver of mitigation.

In the second subissue, Grim asserts that the trial court should have required special counsel to present mitigating evidence to the penalty phase jury notwithstanding the defendant's vocal objection.FN5 In *Hamblen v. State*, 527 So.2d 800 (Fla.1988), we determined that a defendant cannot be forced to present mitigating evidence during the penalty phase of the trial. We reasoned that "all competent defendants have a right to control their own destinies" within the ambit of the rights, responsibilities, and procedures set forth in the constitution and statutes. *Id.* at 804. We therefore continue to hold that a trial court should not be required to appoint special counsel for purposes of presenting mitigating evidence to a penalty phase jury if the defendant has knowingly and voluntarily waived the presentation of such evidence. *See Nixon v. Singletary*, 758 So.2d 618, 625 (Fla.) ("[T]he defendant, not the attorney, is the captain of the ship."), cert. denied, 531 U.S. 980, 121 S. Ct. 429, 148 L. Ed.2d 437 (2000); *Koon v. Dugger*, 619 So.2d 246 (Fla.1993); *Farr v. State*, 621 So.2d 1368 (Fla.1993).

> FN5. Even though special counsel was not appointed to present mitigation during the penalty phase, the trial court did, in fact, appoint special counsel to present mitigation during the sentencing hearing.

*Grim I*, 841 So.2d at 460-62.

2.      Clearly Established Supreme Court Law

In *Lockett v. Ohio*, 438 U.S. 586, 604, 98 S. Ct. 2954, 2965, 57 L. Ed. 2d 973 (1978)(plurality opinion), the Supreme Court held that the Eighth and Fourteenth

Amendments require that the sentencer not be precluded from considering as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." The Court emphasized that an "individualized decision" is essential in capital cases. *Id.*, 438 U.S. at 605. The sentencing body must consider the "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v. North Carolina*, 428 U.S. 280, 304, 96 S. Ct. 2978, 2991, 49 L. Ed. 2d 944 (1976). In *Eddings v. Oklahoma,* 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), a majority of the Court reaffirmed that a sentencer may not be precluded from considering, and may not refuse to consider, any relevant mitigating evidence offered by the defendant as the basis for a sentence less than death. The Court has summarized these decisions as follows:

> Underlying *Lockett* and *Eddings* is the principle that punishment should be directly related to the personal culpability of the criminal defendant. If the sentencer is to make an individualized assessment of the appropriateness of the death penalty, "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown,* 479 U.S. 538, 545, 107 S. Ct. 837, 841, 93 L. Ed. 2d 934 (1987) (O'CONNOR, J., concurring). Moreover, *Eddings* makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer. The sentencer must also be able to consider and give effect to that evidence in imposing sentence. *Hitchcock v. Dugger,* [481 U.S. 393, 107 S. Ct. 1821, 95 L. Ed. 2d 347 (1987)]. Only then can we be sure that the sentencer has treated the defendant as a "uniquely individual human bein[g]" and has made a reliable determination that death is the appropriate sentence. *Woodson,* 428 U.S., at 304, 305, 96 S. Ct., at 2991. "Thus, the sentence imposed at the penalty stage should reflect a reasoned *moral* response to the defendant's background, character, and crime." *California v. Brown, supra,* 479 U.S., at 545, 107 S. Ct., at 841 (O'CONNOR, J., concurring) (emphasis in original).

*Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, 2947, 106 L. Ed. 2d 256 (1989), abrogated on other grounds, *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242 (2002). *See also Abdul-Kabir v. Quarterman*, 550 U.S. 233, 127 S. Ct. 1654, 167 L. Ed. 2d 585 (2007). Therefore, under the Eighth Amendment a sentencer may not be precluded from considering, and may not refuse to consider, any constitutionally relevant evidence as to the defendant's background or character or to the circumstances of the offense that mitigate against imposing the death penalty. *Penry,* 492 U.S. at 318. "States are free to structure and shape consideration of mitigating evidence 'in an effort to achieve a more rational and equitable administration of the death penalty.'" *Boyde v. California*, 494 U.S. 370, 377, 110 S. Ct. 1190, 1196, 108 L. Ed.2d 316 (1990) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181, 108 S. Ct. 2320, 2331, 101 L. Ed.2d 155 (1988)(plurality opinion)). *See Oregon v. Guzek*, 546 U.S. 517, 526, 126 S. Ct. 1226, 1232, 163 L. Ed.2d 1112 (2006)("But the Eighth Amendment does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted.").

3.      Federal Review of Claim

Petitioner contends that the only feasible alternatives in a case in which a defendant waives the presentation of penalty phase mitigation, but does not waive a jury advisory sentencing recommendation, are for the trial court to ignore the jury's sentencing recommendation or present mitigation to the jury in spite of the defendant's waiver. He also alleges that the procedures set out by the Florida Supreme Court in *Muhammad, supra,* to deal with this circumstance fail to adequately protect a defendant's right to have a jury recommend life or death.[19] His solution is to require a special counsel to present mitigating evidence to the jury as well as to

---

[19] The Supreme Court denied certiorari review in *Muhammad v. State*, 782 So.2d 343 (Fla. 2001). *See* 534 U.S. 836, 122 S. Ct. 87, 151 L. Ed.2d 49 (2001) and 534 U.S. 944, 122 S. Ct. 323, 151 L. Ed.2d 241 (2001).

the trial court.[20]  Petitioner, therefore, seems to suggest that a defendant should have the right to waive mitigation, but that this decision should be ignored by the court and mitigation presented despite the waiver.

Petitioner appears to argue that his decision to waive the presentation of mitigating evidence created an unacceptable risk of an arbitrary and capricious imposition of the death penalty in violation of the Eighth Amendment, which requires the sentencer in a capital case to hear and consider all relevant mitigating evidence. While the Supreme Court has not specifically addressed whether the Eighth Amendment prohibits a defendant to waive the presentation of mitigating evidence, in *Schriro v. Landrigan*, *supra*, the Court touched on the issue of a defendant's waiver of evidence.  In *Schriro*, the issue before the Court was whether the district court erred in denying an evidentiary hearing on an ineffective assistance of counsel claim in which the petitioner alleged that counsel failed to investigate possible mitigation even though the defendant instructed his attorney that he wished to waive a mitigation case.  The Court held that based on the state court record the district court "was entitled to conclude that regardless of what information counsel might have uncovered in his investigation, Landrigan would have interrupted and refused to allow his counsel to present any such evidence." *Id*., 550 U.S. at 477.  With regard to Landrigan's waiver, the Court stated:

> The Court of Appeals also stated that the record does not indicate that Landrigan's decision not to present mitigating evidence was "informed and knowing," 441 F.3d [638] at 647 [(9th Cir. 2006)], and that "[t]he trial court's dialogue with Landrigan tells us little about his understanding of the consequences of his decision." *Ibid*. We have never imposed an "informed and knowing" requirement upon a defendant's decision not to introduce evidence. *Cf., e.g., Iowa v. Tovar*, 541 U.S. 77, 88, 124 S. Ct. 1379, 158 L. Ed.2d 209 (2004) (explaining that waiver of the right to counsel must be knowing and intelligent).

---

[20]  The record reflects that Petitioner refused to cooperate with special counsel Spiro Kypreos, so it is unlikely that the jury would have been presented with the quantity and quality of mitigation evidence which Petitioner now argues is required by the Constitution even if Mr. Kypreos had made his case before the jury.

*Id.* at 478-79.

Federal courts of appeals which have addressed this issue have found that a defendant may waive a mitigation case. *See Singleton v. Lockhart*, 962 F.2d 1315, 1322 (8th Cir.1992)("If a defendant may be found competent to waive the right of appellate review of a death sentence, we see no reason why a defendant may not also be found competent to waive the right to present mitigating evidence that might forestall the imposition of such a sentence in the first instance"); *Tyler v. Mitchell*, 416 F.3d 500, 503-04 (6th Cir. 2005)(holding that because a capital defendant's counsel is not constitutionally ineffective when a competent defendant prevents him from investigating and presenting mitigation evidence, it follows that the Constitution does not prohibit a competent capital defendant from waiving the presentation of mitigation evidence); *See also Chandler v. United States*, 218 F.3d 1305, 1319 n. 25 (11th Cir.2000) ("the cases concerning the constitutional right of defendants not to be precluded or limited by the state or the court in their presentation of mitigation evidence at sentencing do not support the proposition that, if counsel does not present all possible mitigation at sentencing, then defendant has been denied some constitutional right")." Petitioner supports his argument by citing only one federal case, *Espinosa v. Florida*, 505 U.S. 1079, 112 S. Ct. 2926, 120 L. Ed. 2d 854 (1992)(per curiam) in which the Supreme Court held that a jury's consideration of a vague aggravating circumstance taints a judge's later sentence of death. The Court held that "[b]y giving 'great weight' to the jury recommendation, the trial court indirectly weighed the invalid aggravating factor that we must presume the jury found. This kind of indirect weighing of an invalid aggravating factor creates the same potential for arbitrariness as the direct weighing of an invalid aggravating factor, and the result, therefore, was error." *Id.*, 505 U.S. at 1082 (citation omitted). *Espinosa*, however, does not address the specific issue raised by Petitioner here, and in reviewing *Lockett v. Ohio*, *supra*, and its progeny, cases more directly related to this issue, this court is not convinced that any of these cases can be extended to require

the sentencing judge to hear and consider all relevant mitigating evidence against the express wishes of the defendant. Petitioner has cited no federal law even marginally supportive of this proposition, much less establishing it as a requirement. Because there is no Supreme Court law on this issue, the Florida Supreme Court's rejection of Petitioner's claim is not contrary to, and does not involve an unreasonable application of, clearly established federal law as determined by the Supreme Court. In *Lockyer v. Andrade, supra*, the Supreme Court held that the "clearly established law" requirement "refers to holdings, as opposed to dicta, of [the] . . . Court's decisions as of the time of the relevant state-court decision." 538 U.S. at 71 (quoting *Williams v. Taylor*, *supra,* 529 U.S. at 412); see *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir. 2002)(where no Supreme Court precedent is on point, the court cannot say that the state court's conclusion is contrary to clearly established Federal law as determined by the Supreme Court).

Finally, this court is satisfied that the sentencing judge in Petitioner's case considered all available and relevant mitigating evidence, considering Petitioner's waiver and lack of cooperation with special counsel Kypreos. In its sentencing order the trial court specifically acknowledged that the jury did not hear any mitigating evidence, then independently weighed the aggravating and mitigating circumstances and found that a sentence of death was supported by the facts of the case.[21] Petitioner was fully advised by both counsel and the court of the risk of not presenting mitigating evidence, and he was warned that the court would give great weight to the jury's recommendation regardless of whether he presented mitigating evidence. Petitioner advised the court that he understood and accepted these risks. The trial judge went to great pains to ascertain that Petitioner's waiver was knowing and intelligent. He also ordered a pre-sentence report and appointed special counsel

---

[21] *See Espinosa v. Florida,* 505 U.S.1079, 1082, 112 S. Ct 2926, 2928, 120 L. Ed. 2d 854 (1992) ("Florida has essentially split the weighing process in two. Initially, the jury weighs aggravating and mitigating circumstances, and the result of that weighing process is then in turn weighed within the trial court's process of weighing aggravating and mitigating circumstances").

to provide mitigation in addition to that proffered by Mr. Rollo during the *Koon* hearing. The court is satisfied that all of the available mitigation was considered and weighed by the court in this case and that Petitioner's death sentence is reliable as contemplated by Supreme Court law. Therefore, this ground is denied.

**Ground VII: Trial Court Erred in not Calling Dr. Larson as its own Witness**

Petitioner contends that the trial court should have called Dr. Larson to testify about any mental health mitigation that may have existed and that the failure to do so violated his Eighth and Fourteenth Amendment rights. Doc. 1 at 140-42.

**1. State Court Proceedings**

Petitioner raised this issue in the direct appeal of his conviction and sentence. The Florida Supreme Court denied relief, holding:

> Mitigating evidence must be considered and weighed when contained "anywhere in the record, to the extent it is believable and uncontroverted." *Robinson v. State*, 684 So.2d 175, 177 (Fla.1996). This duty extends to cases where the defendant argues in favor of the death penalty or where the defendant asks the trial court not to consider mitigating evidence. *See Farr*, 621 So.2d at 1369. "[T]he trial judge must carefully analyze all the possible statutory and nonstatutory mitigating factors against the established aggravators to ensure that death is appropriate." *Robinson*, 684 So.2d at 177. If a defendant chooses not to submit proof of mitigating circumstances, the trial court is not required to accept potential mitigating circumstances as proven based on defense counsel's proffer of evidence. *See Chandler v. State*, 702 So.2d 186, 199-201 (Fla.1997). Proffered evidence is merely a representation of what evidence the defendant proposes to present and is not actual evidence. *See State v. Warner*, 721 So.2d 767, 769 (Fla. 4th DCA 1998) ("[A] proffer is not evidence ...."), approved on other grounds, 762 So.2d 507 (Fla.2000). Because Grim waived the presentation of mitigation during the penalty phase in the present case, we conclude that he cannot complain on appeal that the trial court abused its discretion by not calling Dr. Larson as its own witness to testify relative to two possible mental statutory mitigators. *See LaMarca v. State*, 785 So.2d 1209 (Fla.), cert. denied, 534 U.S. 925, 122 S. Ct. 281, 151 L. Ed.2d 207 (2001) (holding that the trial court properly declined to evaluate proffered mitigation evidence during sentencing because the defendant had waived the presentation of mitigating evidence).

*Grim I*, 841 So.2d at 462.

2.    **Clearly Established Supreme Court Law**

It is a long-standing prerequisite to the filing of a federal habeas corpus petition that the petitioner first exhaust available state court remedies, 28 U.S.C. §2254(b)(1),[22] thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365, 115 S. Ct. 887, 888, 130 L. Ed.2d 865 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275, 92 S. Ct. 509, 30 L. Ed. 2d 438 (1971) (citation omitted)).  To satisfy the exhaustion requirement, the petitioner must "fairly present" his claim in each appropriate state court, alerting that court to the federal nature of the claim.  *Duncan*, 513 U.S. at 365-66; *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 119 S. Ct. 1728, 144 L. Ed.2d 1 (1999); *Picard*, 404 U.S. at 277-78.

The Supreme Court has provided lower courts with guidance for determining whether a habeas petitioner has met the "fair presentation" requirement.  In *Picard v. Connor*, the Court held that, for purposes of exhausting state remedies, a claim for relief in habeas corpus must include reference to a specific federal constitutional guarantee, as well as a statement of the facts which entitle the petitioner to relief. 404 U.S. at 277.  In announcing that "the substance of a federal habeas corpus claim must first be presented to the state courts," *id.*, 404 U.S. at 278, the Court rejected the

---

[22]  Section 2254 provides, in pertinent part:

(b)(1)    An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
        (A)  the applicant has exhausted the remedies available in the courts of the State; or
        (B) (i)  there is an absence of available State corrective process; or
            (ii)  circumstances exist that render such process ineffective to protect the rights of the applicant.
. . . .
(c)  An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented.

contention in that case that the petitioner had satisfied the exhaustion requirement by presenting the state courts only with the facts necessary to state a claim for relief.

Additionally, the Court has indicated that it is not enough that a petitioner make a general appeal to a constitutional guarantee as broad as due process to present the "substance" of such a claim to a state court. *Anderson v. Harless*, 459 U.S. 4, 103 S. Ct. 276, 74 L. Ed. 2d 3 (1982). In *Anderson*, the habeas petitioner was granted relief by the Sixth Circuit Court of Appeals on the ground that a jury instruction violated due process because it obviated the requirement that the prosecutor prove all the elements of the crime beyond a reasonable doubt. 459 U.S. at 7 (citing *Sandstrom v. Montana*, 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)). The only manner in which the habeas petitioner had cited federal authority was by referring to a state court decision in which "the defendant . . . asserted a broad federal due process right to jury instructions that properly explain state law." *Anderson*, 459 U.S. at 7 (internal quotation marks omitted). The Court expressed doubt that a defendant's citation to a state-court decision predicated solely on state law was sufficient to fairly apprise a reviewing court of a potential federal claim merely because the defendant in the cited case advanced a federal claim. Furthermore, the Court clarified that such a citation was obviously insufficient when the record satisfied the federal habeas court that the federal claim asserted in the cited case was not the same as the federal claim on which federal habeas relief was sought. 459 U.S. at 7 and n. 3.

Years later, the Supreme Court readdressed the "fair presentation" requirement in *Duncan v. Henry, supra*. The *Duncan* Court strictly construed the exhaustion requirement so as to mandate that, if state and federal constitutional law overlap in their applicability to a petitioner's claim, the petitioner must raise his issue in terms of the applicable federal right in state court in order to obtain federal review

of the issue.[23]  The Supreme Court explained,"[i]f a habeas petitioner wishes to claim that an evidentiary ruling at a state court trial denied him the due process of law guaranteed by the Fourteenth Amendment, he must say so, not only in federal, but in state court." *Duncan*, 513 U.S. at 365-66.  More recently, the Supreme Court again focused upon the requirement of "fair presentation," holding that  "ordinarily a state prisoner does not 'fairly present' a claim to a state court if that court must read beyond a petition or a brief (or a similar document) that does not alert it to the presence of a federal claim in order to find material, such as a lower court opinion in the case, that does so." *Baldwin v. Reese*, 541 U.S. 27, 124 S. Ct. 1347, 1351, 158 L. Ed. 2d 64 (2004).  In *Baldwin*, the Supreme Court recognized that "a litigant wishing to raise a federal issue can easily indicate the federal law basis for his claim in a state court petition or brief, for example, by citing in conjunction with the claim the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'"  *Id.*  This language, while not part of the Court's holding, provides helpful instruction.  With regard to this language, the Eleventh Circuit explained in *McNair v. Campbell*, 416 F.3d 1291 (11th Cir. 2005):

> If read in a vacuum, this dicta might be thought to create a low floor indeed for petitioners seeking to establish exhaustion.  However, we agree with the district court that this language must be "applied with common sense and in light of the purpose underlying the exhaustion requirement[:] 'to afford the state courts a meaningful opportunity to consider allegations of legal error without interference from the federal judiciary.'"  *McNair* [*v. Campbell*], 315 F. Supp. 2d at 1184 (quoting *Vasquez v. Hillery*, 474 U.S. 254, 257, 106 S. Ct. 617, 620, 88 L. Ed. 2d 598 (1986)).  This is consistent with settled law established by the Supreme Court. . . . We therefore hold that "'[t]he exhaustion doctrine requires a habeas applicant to do more than scatter some makeshift needles in the haystack of the state court record.'"

---

[23]  The petitioner in *Duncan* raised a federal due process claim in his habeas petition, but had raised only a state constitutional claim in his state appeal.  Presented with a state constitutional claim, the state court applied state law in resolving the appeal. *Duncan v. Henry*, 513 U.S. 364, 366, 115 S. Ct. 887, 888, 130 L. Ed. 2d 865 (1995).

*Id.*, 416 F.3d at 1302-03 (citations omitted).[24]

The Eleventh Circuit, prior to *Duncan*, had broadly interpreted the "fair presentation" requirement.[25] After *Duncan*, however, the Eleventh Circuit has taken a more narrow approach. For example, in *Zeigler v. Crosby*, the court held that the habeas petitioner failed to "fairly present" his juror misconduct claims to the state courts where his brief to the state appellate court did not refer to the federal constitutional issues raised in his federal habeas petition, and none of the cases cited in his direct appeal discussed the United States Constitution. 345 F.3d 1300, 1307 (11th Cir. 2003). The court specifically noted that the section of the petitioner's appellate brief which dealt with juror misconduct contained the words: "Appellant was denied due process and a fair trial. . . .," which could be interpreted as asserting a fair trial claim under the Due Process Clause of the Florida Constitution. *Id.* at 1308 n.5. The only cases cited in the discussion of the issue in petitioner's state appellate brief were state supreme court cases that made no mention of the United States Constitution and cited no federal cases. The court concluded that petitioner's "[c]ursory and conclusional sentence (unaccompanied by citations to federal law), . . . did not present to the Florida courts the federal claim asserted to us." *Id.*

---

[24] In his initial brief before the Court of Criminal Appeals, McNair cited one federal case in a string citation containing other state cases, and in a closing paragraph in his argument that extraneous materials were considered by the jury during deliberations, stated that there was a violation of his rights "protected by the Fifth, Sixth, Eighth[,] and Fourteenth Amendments to the United States Constitution, the Alabama Constitution[,] and Alabama law." *McNair v. Campbell*, 416 F.3d 1291, 1303 (11th Cir. 2005). The court found that these references to federal law were not sufficient to meet the fair presentment requirement and noted that it was important that the petitioner had never mentioned the federal standards regarding extraneous materials in his brief and instead relied on state law for his arguments. *Id.*

[25] *See*, *e.g.*, *Watson v. Dugger*, 945 F.2d 367 (11th Cir. 1991) (finding issue to be exhausted when petitioner argued in state court that trial court misapplied state law when it refused to give petitioner's requested jury instruction and thereby allowed the jury to convict without necessary showing of criminal intent, and argued in federal court that this was a due process violation); *Mattox v. Dugger*, 839 F.2d 1523 (11th Cir. 1988) (holding that a federal habeas corpus petition should not be dismissed on grounds of procedural default when a petitioner has previously brought an issue before a state court alleging only state law violations, when such a claim is equally supported by federal law, and the state cites such federal law in support of its position); *Hutchins v. Wainwright*, 715 F.2d 512, 518-19 (11th Cir. 1983) (petitioner exhausted Sixth Amendment confrontation clause claim in state court by raising hearsay objections, even though petitioner never raised Sixth Amendment claim in state court).

An issue that was not presented to the state court and which can no longer be litigated under state procedural rules is considered procedurally defaulted, *i.e.*, procedurally barred from federal review. *O'Sullivan*, 526 U.S. at 839-40, 848, 119 S.Ct. at 1734; *Bailey v. Nagle*, 172 F.3d 1299, 1302-03 (11th Cir. 1999). This court will also consider a claim procedurally defaulted if it was presented in state court and rejected on the independent and adequate state ground of procedural bar or default. *Coleman v. Thompson*, 501 U.S. 722, 734-35 and n. 1, 111 S.Ct. 2546, 2555, 115 L. Ed.2d 640 (1991); *Caniff v. Moore*, 269 F.3d 1245, 1247 (11th Cir. 2001) ("[C]laims that have been held to be procedurally defaulted under state law cannot be addressed by federal courts."); *Chambers v. Thompson*, 150 F.3d 1324, 1326-27 (11th Cir. 1998) (applicable state procedural bar should be enforced by federal court even as to a claim which has never been presented to a state court); *accord Tower v. Phillips*, 7 F.3d 206, 210 (11th Cir. 1993); *Parker v. Dugger*, 876 F.2d 1470 (11th Cir. 1990), *rev'd on other grounds*, 498 U.S. 308, 111 S. Ct. 731, 112 L.Ed.2d 812 (1991). In the first instance, the federal court must determine whether any future attempt to exhaust state remedies would be futile under the state's procedural default doctrine. *Bailey*, 172 F.3d at 1303. In the second instance, a federal court must determine whether the state's procedural default ruling rested on adequate state grounds independent of the federal question. *See Harris v. Reed*, 489 U.S. 255, 109 S. Ct. 1038, 1043, 103 L. Ed. 2d 308 (1989). The adequacy of a state procedural bar to the assertion of a federal question is itself a federal question. *Lee v. Kemna*, 534 U.S. 362, 122 S. Ct. 877, 885, 151 L. Ed.2d 820 (2002). The adequacy requirement has been interpreted to mean that the rule must be "firmly established and regularly followed," *Siebert v. Allen*, 455 F.3d 1269, 1271 (11th Cir. 2006), that is, not applied in an "arbitrary or unprecedented fashion," *Judd v. Haley*, 250 F.3d 1308,1313 (11th Cir. 2001), or in a manifestly unfair manner. *Ford v. Georgia*, 498 U.S. 411, 424-25, 111 S. Ct. 850, 858, 112 L. Ed.2d 935 (1991); *Upshaw v. Singletary*, 70 F.3d 576, 579 (11th Cir. 1995).

To overcome a procedural default such that the federal habeas court may consider the merits of a claim, a petitioner must show cause and prejudice or a fundamental miscarriage of justice. *Tower*, 7 F.3d at 210; *Parker*, 876 F.2d 1470. "For cause to exist, an external impediment, whether it be governmental interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from raising the claim." *McCleskey v. Zant*, 499 U.S. 467, 497, 111 S. Ct. 1454, 1472, 113 L. Ed. 2d 517 (1991) (quoting *Murray v. Carrier*, 477 U.S. 478, 488, 106 S. Ct. 2639, 2645, 91 L. Ed.2d 397 (1986)). Lack of counsel or ignorance of available procedures is not enough to establish cause. *Tower v. Phillips, supra.* To satisfy the miscarriage of justice exception, a petitioner must show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Schlup v. Delo*, 513 U.S. 298, 327, 115 S. Ct. 85, 130 L. Ed.2d 808 (1995). "To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him." *Schlup*, 513 U.S. at 327. Further:

> a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare. To be credible, such a claim requires [a] petitioner to support his allegations of constitutional error with new reliable evidence -- whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence -- that was not presented at trial.

*Id.*

### 3. Federal Review of Claim

In this case, Respondents contend that Petitioner did not fairly present his claim as a federal claim in state court. A review of Petitioner's Initial Brief on appeal to the Florida Supreme Court supports this contention. *See* Initial Brief of Appellant, PCR at 28-33. There is only one citation to the Eighth and Fourteenth Amendments in the caption of the brief. Petitioner did not cite any Supreme Court law or other federal cases addressing his claims and relied instead solely on state cases. Furthermore, the argument presented in his federal habeas petition on this issue is nearly identical to his state court brief. Petitioner did not fairly present this claim in

state court, and it is therefore, procedurally barred from federal habeas review. Because Petitioner is barred by state procedural rules from exhausting the substance of his claims, procedural default exists for purposes of federal habeas review. *See Coleman v. Thompson, supra.* Additionally, Petitioner has not made the requisite showing to excuse his default. Therefore, this claim cannot support habeas relief.

**Ground VIII:       Ineffective Assistance of Appellate Counsel**

    **A.       Trial court's ruling on motion to suppress evidence seized at Grim's residence was error and appellate counsel was ineffective in failing to appeal the denial of the motion to suppress**

Petitioner contends the trial court erred in denying a motion to suppress evidence collected during a search of his residence. He also alleges that the failure to raise this error on appeal was ineffective assistance of appellate counsel. Doc. 1 at 143-47.

    **1.       State Court Proceedings**

Petitioner raised this issue in his motion for postconviction relief, and the postconviction court denied the claim. The Florida Supreme Court affirmed as follows:

> We summarized the test for reviewing ineffective assistance of appellate counsel claims in *Nixon v. State*, 932 So.2d 1009 (Fla.2006):
>
>> Claims of ineffective assistance of appellate counsel are properly raised in a habeas petition before the court that heard the defendant's direct appeal. The standard to be applied to these claims parallels the standard applied to claims involving the effectiveness of trial counsel as set forth in *Strickland v. Washington*, 466 U.S. 668[, 104 S.Ct. 2052, 80 L. Ed.2d 674] (1984). Thus, a defendant must demonstrate that appellate counsel's performance was deficient and that the defendant was prejudiced by the deficient performance. Prejudice is demonstrated by showing that the appellate process was compromised to the degree that confidence in the correctness of the appellate result is undermined. Moreover, the appellate court must presume that counsel's performance falls within that wide range of reasonable professional assistance.

*Id.* at 1023 (citations omitted). When considering whether appellate counsel was ineffective for failing to appeal a trial court's evidentiary ruling, this Court reviews the prejudice prong first:

> With regard to evidentiary objections which trial counsel made during the trial and which appellate counsel did not raise on direct appeal, this Court evaluates the prejudice or second prong of the *Strickland* test first.... If we conclude that the trial court's ruling was not erroneous, then it naturally follows that habeas petitioner was not prejudiced on account of appellate counsel's failure to raise that issue.

*Peterka v. State*, 890 So.2d 219, 242 (Fla.2004) (quoting *Jones v. Moore*, 794 So.2d 579, 583-84 (Fla.2001)). Therefore, if we determine that the trial court's denial of Grim's motion to suppress was not erroneous, then Grim's ineffective assistance of appellate counsel claim fails. Both a magistrate's probable cause determination and a trial court's ruling on a motion to suppress are accorded a presumption of correctness. *State v. Panzino*, 583 So.2d 1059, 1062 (Fla. 5th DCA 1991).

In his motion to suppress, Grim argued that officers omitted two facts from the search warrant affidavit that would have made a finding of probable cause impossible: (1) that two officers looked through Grim's house briefly and noticed some "old stains" but found no clear indications of blood, and (2) that Grim was not under arrest when he left his house and eluded the officer following him. As the Fifth District explained in *Panzino*,

> When a fact is omitted from an affidavit filed in support of an application for a search warrant the reviewing court must determine whether the omission constitutes a material omission. A fact constitutes a material omission if a substantial possibility exists that knowledge of the omission would have altered a reasonable magistrate's probable cause determination. In determining whether a material omitted fact should invalidate the search warrant, the reviewing court must view the affidavit as if it had included the omitted fact and then determine whether the affidavit provides sufficient probable cause.

*Id.* at 1062. A review of the affidavit in this case supports the trial court's ruling.

The order denying Grim's motion to suppress states: "Having reviewed the Affidavit as if it included the omitted facts, this court finds that the

Affidavit still provides sufficient probable cause for the issuance of a warrant to search the Defendant's residence. There is no substantial probability that had the magistrate been apprised of these omissions ... that he would not have found probable cause." This analysis comports with the requirements stated in *Panzino*, and is supported by the totality of the facts alleged in the search warrant affidavit. Even if the omitted facts were included, there was still evidence that Grim was the last person seen with the victim; that he did not report to work that morning; that he appeared to have dried blood on his shoulder, elbow and shorts; and that a piece of green carpet matching that in which the victim was wrapped was seen at Grim's home. These included facts support the trial court's conclusion that the omitted facts would not have led the magistrate to alter his probable cause determination.

Grim's motion to suppress also stated that his home was left unguarded for several hours between the time officers left the scene and when they returned with a search warrant. The motion argues that "this left the scene open to tampering, tainting, or planting of evidence." As the trial court noted, Grim offers no evidence that any of this activity occurred. Thus the trial court properly denied this claim.

We hold that the trial court's denial of Grim's motion to suppress was not erroneous. Therefore, Grim could not have been prejudiced by appellate counsel's failure to appeal the trial court's denial. Accordingly, we reject Grim's ineffective assistance of appellate counsel claim.

*Grim II*, 971 So.2d at 104-05.

2.      Clearly Established Supreme Court Law

With regard to Petitioner's allegation that the trial court erred in its ruling on his motion to suppress, Respondents correctly assert that a federal habeas petitioner may not challenge a state trial court's ruling on a Fourth Amendment claim in his federal petition. *See Stone v. Powell*, 428 U.S. 465, 96 S. Ct. 3037, 49 L. Ed. 2d 1067 (1976). The restriction on federal habeas review of Fourth Amendment claims announced in *Stone*, however, does not extend to Sixth Amendment ineffective assistance of counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue. *See Kimmelman v. Morrison*, 477 U.S. 365, 106 S. Ct. 2574, 91 L. Ed. 2d 305 (1986).

The proper standard for evaluating a claim of ineffective assistance of appellate counsel is that enunciated in *Strickland*. *See Smith v. Robbins*, 528 U.S. 259, 285, 120 S. Ct. 746, 764, 145 L. Ed.2d 746 (2000). The Supreme Court has held that counsel need not raise every nonfrivolous claim on appeal. *See Jones v. Barnes*, 463 U.S. 745, 103 S. Ct. 3308, 77 L. Ed.2d 987 (1983). The Court in *Jones* emphasized the importance of winnowing out weaker arguments in favor of stronger ones:

> 'Most cases present only one, two, or three significant questions . . . . Usually, . . . if you cannot win on a few major points, the others are not likely to help, and to attempt to deal with a great many in the limited number of pages allowed for briefs will mean that none may receive adequate attention. The effect of adding weaker arguments will be to dilute the force of the stronger ones.' (Citing R. Stern, Appellate Practice in the United States 266 (1981)).

*Id.*, 463 U.S. at 752. The Court has also stated that while it is possible to bring a *Strickland* claim based on appellate counsel's failure to raise a particular claim in a merits brief, it will be difficult to demonstrate incompetence. *See Robbins*, 528 U.S. at 288. "'Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.'" *Id.* (cite omitted). To demonstrate prejudice, Petitioner in this case must show a reasonable probability that, but for his counsel's unreasonable failure to brief a particular issue, Petitioner would have prevailed on appeal. *See id.* at 285.

3. **Federal Review of Claim**

With regard to the allegation that Petitioner's appellate counsel was ineffective, the Florida Supreme Court cited *Strickland* as the legal standard for analyzing claims of ineffective assistance of appellate counsel and applied those standards to Petitioner's claims. *Grim II,* 971 So. 2d at 104. The court, therefore, applied the correct legal rule based on Supreme Court precedent. Accordingly, the remaining issue is whether the state court's denial of Petitioner's claim resulted in an unreasonable application of *Strickland*.

The Florida Supreme Court found that the search warrant affidavit contained sufficient facts to warrant probable cause, even after including the facts raised by Petitioner which were omitted.  The court found, "there was still evidence that Grim was the last person seen with the victim; that he did not report to work that morning; that he appeared to have dried blood on his shoulder, elbow and shorts; and that a piece of green carpet matching that in which the victim was wrapped was seen at Grim's home." *Grim II*, 971 So.2d at 105. The court also agreed with the trial court's finding that Petitioner presented no evidence that the scene, his home, was tampered with, tainted or planted with evidence in the time it was left unattended. *Id*. Petitioner must show a reasonable probability that, but for his counsel's unreasonable failure to raise this issue on appeal, he would have prevailed on appeal.  Since the Florida Supreme Court determined that an appeal of this issue would have been unsuccessful, Petitioner cannot meet this burden.

The state court's decision--that Petitioner was not denied the effective assistance of appellate counsel--resolved a question of whether a search warrant was properly issued under state law.  Because Petitioner has not shown that the state court's decision was otherwise contrary to, or an unreasonable application of, relevant Supreme Court precedent governing claims of ineffective assistance of counsel,  Petitioner is not entitled to habeas relief under AEDPA.  He has identified no Supreme Court case finding constitutionally deficient performance under similar circumstances nor has he identified how his appellate counsel's representation was unreasonable.  *See Shere v. Sec'y, Fla. Dep't. of Corrs*, 537 F.3d 1304, 1310 (11th Cir. 2008).  ("Shere has identified no United States Supreme Court case holding appellate counsel rendered constitutionally deficient performance in a situation like that before us, *i.e.*, where appellate counsel failed to challenge a prosecutor's references to religion during the cross-examination of witnesses who had already testified to religious matters on direct"). Accordingly, the Florida Supreme Court's decision is neither contrary to, nor an unreasonable application of, clearly established Supreme

Court law.   Therefore, relief on this ground will be denied.   *See* § 2254(d)(1); *Kimmelman*, 477 U.S. at 384; *see also Strickland*, 466 U.S. at 689.

      B.     Failure to appeal Officer Newland's penalty-phase testimony

Petitioner contends that Officer Newland, a penalty phase witness called to establish the prior violent felony conviction aggravator, testified extensively as to the facts of his convictions in several 1982 cases, including prejudicial and irrelevant details and hearsay, and that her testimony went beyond the narrow question of whether he was convicted of a prior violent felony.   Petitioner alleges that the failure to raise this error on appeal was ineffective assistance of appellate counsel.   Doc. 1 at 147-53.

      1.     State Court Proceedings

Petitioner raised this issue in his motion for postconviction relief and the postconviction court denied the claim.   The Florida Supreme Court affirmed as follows:

> At the penalty phase, Officer Newland testified about the details of several of Grim's prior violent felony convictions. Grim asserts that this testimony impermissibly dominated the penalty phase and that appellate counsel should have raised this claim on appeal.
>
> Grim's claim is refuted by the record. Newland was one of three witnesses who testified during the penalty phase. Her testimony comprises only eleven pages of the record and only six of those pages concern the details of Grim's prior felonies. While it is true that defense counsel objected to Newland's description of Grim's prior violent felonies, the trial court did not overrule the objection. Rather, defense counsel and the assistant state attorney approached the bench, discussed the issue, and arrived at a mutually satisfactory compromise.
>
> As Grim acknowledges in his petition, the facts of prior violent felony convictions may be introduced during the penalty phase. *See Carpenter v. State*, 785 So.2d 1182, 1208 (Fla.2001) ("As a general rule, '[d]etails of prior felony convictions involving the use or threat of violence to the victim are admissible in the penalty phase of a capital trial.' " (quoting *Waterhouse v. State*, 596 So.2d 1008, 1016 (Fla.1992))). "The purpose for this rule is to engage in a character analysis to determine whether the death penalty is appropriate." *Carpenter*, 785 So.2d at 1208. While it is

also true that these descriptions may not become the "feature" of the penalty phase, *see id.*, the record reflects that this did not occur in Grim's case. Grim fails to establish that appellate counsel's failure to raise this claim on appeal was either deficient or prejudicial, and we deny this claim.

*Grim II*, 971 So.2d at 105.

2.      **Clearly Established Supreme Court Law**

The standard for ineffective assistance of appellate counsel is set forth *supra*.

3.      **Federal Review of Claim**

Petitioner claims both trial court error in denying trial counsel's objection to Officer Newland's testimony and ineffective assistance of appellate counsel in not raising the error on direct appeal of his conviction and sentence.  On the issue of the ineffective assistance of his appellate counsel, Florida law permits the introduction of the facts surrounding a prior violent felony conviction as long as the details of the prior crime do not become a feature of the penalty phase.

> As a general rule, "[d]etails of prior felony convictions involving the use or threat of violence to the victim are admissible in the penalty phase of a capital trial." *Waterhouse v. State*, 596 So.2d 1008, 1016 (Fla.1992). The purpose for this rule is to engage in a character analysis to determine whether the death penalty is appropriate. *See Stewart v. State*, 558 So.2d 416, 419 (Fla.1990). But the details of the collateral offense must not become the feature of the penalty phase. *See Finney v. State*, 660 So.2d 674, 683 (Fla.1995). This Court has limited the scope of the prior violent felony aggravator statute by allowing only evidence of the violent crime for which the defendant was actually convicted. *See Donaldson v. State*, 722 So.2d 177, 184 (Fla.1998).

*Carpenter v. State*, 785 So.2d 1182, 1208 (Fla. 2001)(Wells, J., dissenting). The record reflects that Officer Newland, who at the time of the prior offense was a patrol officer, arrested Petitioner on September 9, 1982, for abducting a woman at gunpoint who, after escaping, identified Petitioner as the perpetrator.  T. Vol. V at 877, 881.  As part of her testimony relating the events surrounding this crime for which Petitioner was convicted, Officer Newland began to describe other incidents which occurred on the same morning near where the abduction occurred.  Petitioner's attorney, Mr. Rollo,

objected to the testimony regarding these incidents and after a bench conference agreed to Officer Newland reading a summary of these incidents to the jury. *Id.* at 882-85. These incidents included two break-ins, one of which involved a battery with a knife; an attempted abduction of a fourteen year old girl; and a burglary in which revolvers were stolen and later found to be in the possession of Petitioner. *See id.* at 885-87.

The Florida Supreme Court found that Officer Newland's testimony regarding Petitioner's prior criminal activities comprised only six pages of her eleven pages of testimony, and that this testimony did not become a feature of the penalty phase. The court concluded that Officer Newland's testimony was permissible under state law. Therefore, even if the issue had been raised on appeal, Petitioner would not have prevailed. Thus, the state court found no deficient performance or prejudice under *Strickland* for counsel's failure to raise the issue on appeal. Additionally, there is evidence in the record supporting the state court's conclusion that the prosecutor and defense attorneys arrived at a mutually satisfactory compromise with regard to this testimony.

Petitioner has not demonstrated that the state court's decision was contrary to, or an unreasonable application of, relevant Supreme Court precedent governing claims of ineffective assistance of appellate counsel. Additionally, he has identified no Supreme Court case holding appellate counsel rendered constitutionally deficient performance in a situation like the one he raises here. *See Shere, supra*, 537 F.3d at 1310. Accordingly, the Florida Supreme Court's decision is neither contrary to, nor an unreasonable application of, clearly established United States Supreme Court law, and relief on this ground will be denied. *See* § 2254(d)(1); *Kimmelman*, 477 U.S. at

384; *see also Strickland*, 466 U.S. at 689.[26]  Therefore, Petitioner is not entitled to habeas relief on this ground.

**Ground IX:  Florida's Capital Sentencing Scheme is Unconstitutional Under *Ring v. Arizona***

Petitioner contends that Florida's death penalty statute, *see* Fla. Stat. § 921.141, is unconstitutional because it requires the judge, without aid of the jury, to make findings necessary for the imposition of a death sentence in violation of *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).  He argues further the statute is unconstitutional because the state is not required to convince the jury that death is warranted beyond a reasonable doubt.   Finally, he insists his death sentence must be vacated because elements of the offense necessary to establish capital murder were not charged in the indictment.  Doc. 1 at 154-74.

**1.     State Court Proceedings**

Petitioner raised these issues on direct appeal of his conviction and sentence. The Florida Supreme Court denied relief as follows:

> This Court addressed a similar contention in *Bottoson v. Moore*, 833 So.2d 693 (Fla.), cert. denied, 537 U.S. 1070, 123 S. Ct. 662, 154 L. Ed. 2d 564 (2002), and *King v. Moore*, 831 So.2d 143 (Fla.), cert. denied, 537 U.S. 1067, 123 S. Ct. 657, 154 L. Ed. 2d 556 (2002), and denied relief. We likewise find that Grim is not entitled to relief on this claim. The aggravating circumstances which were present in this case included multiple convictions for prior violent felonies and a contemporaneous

---

[26] As a general rule "the States enjoy their traditional latitude to prescribe the method by which those who commit murder shall be punished." *Blystone v. Pennsylvania*, 494 U.S. 299, 309, 110 S. Ct. 1078, 1084, 108 L. Ed. 2d 255 (1990). This latitude extends to evidentiary rules at sentencing proceedings. *See, e.g., Gregg v. Georgia*, 428 U.S. 153, 203-04, 96 S. Ct. 2909, 2939, 49 L. Ed. 2d 859 (1976)(approving "the wide scope of evidence and argument allowed at presentence hearings" in Georgia).  The Court observed in *California v. Ramos*, 463 U.S. 992, 999, 103 S. Ct. 3446, 3452, 77 L. Ed. 2d 1171 (1983):

> In ensuring that the death penalty is not meted out arbitrarily or capriciously, the Court's principal concern has been more with the procedure by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty.

*See also id.,* 463 U.S. at 1008 ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty ... the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment").

Case No.: 3:08cv2/MCR

felony of a sexual battery, both of which were found unanimously by a jury. Moreover, by a twelve-to-zero vote, the jury recommended that the defendant be sentenced to death.

*Grim I*, 841 So.2d at 465.

Additionally, on the question of whether Petitioner's death sentence was proportionate to the crime, the Florida Supreme Court found:

However, based on our independent obligation to review the record, we find the evidence sufficient to support each conviction. We further conclude that the death penalty is proportional. *See, e.g., Darling v. State*, 808 So.2d 145 (Fla.2002) (finding death sentence proportional where murder was committed while defendant was engaged in the commission of the crime of armed sexual battery, defendant had been previously convicted of felony involving the use or threat of violence to the person, and record did not support a finding of immaturity or significant mental deficiency); *Bryant v. State*, 785 So.2d 422 (Fla.), cert. denied, 534 U.S. 1025, 122 S. Ct. 557, 151 L. Ed. 2d 432 (2001) (finding the sentence of death proportional where three aggravators of prior convictions for violent felonies, murder committed while engaged in the commission of a robbery, and avoidance of a lawful arrest or effecting an escape from custody outweighed the nonstatutory mitigator of remorse); *Pope v. State*, 679 So.2d 710 (Fla.1996) (holding death penalty proportional where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed two statutory mitigating circumstances of commission while under influence of extreme mental or emotional disturbance and impaired capacity to appreciate criminality of conduct and several nonstatutory mitigating circumstances); *Melton v. State*, 638 So.2d 927 (Fla.1994) (holding death penalty proportional where two aggravating factors of murder committed for pecuniary gain and prior violent felony outweighed some nonstatutory mitigation); *Heath v. State*, 648 So.2d 660 (Fla.1994) (affirming defendant's death sentence based on presence of two aggravating factors of prior violent felony and murder committed during course of robbery, despite the existence of the statutory mitigator of extreme mental or emotional disturbance).

*Id*. at 464-65.

## 2.	Clearly Established Supreme Court Law

In ***Ring v. Arizona,*** **536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Supreme Court held that in a death penalty case a sentencing judge, sitting without a jury, may not determine the existence of an aggravating circumstance sufficient to support an increase in the statutory penalty from life to death; in such cases, the Sixth Amendment requires the aggravating circumstance to be found by a jury. In explaining its decision, the Court reviewed its reasoning in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) and stated, "[i]f a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact-no matter how the State labels it-must be found by a jury beyond a reasonable doubt. A defendant may not be "expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Ring,* 536 U.S. at 602 (quoting *Apprendi*, 530 U.S. at 483) (internal citations omitted). The Court noted, however, that its decision in *Ring* was "tightly delineated" in that Ring argued only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. *Id.* at 597 n.4.**

## 3.	Federal Review of Claim

**Contrary to Petitioner's assertion, Florida's capital sentencing procedures do not implicate the Sixth Amendment concern identified in *Ring*, which was that Arizona's death penalty system committed *both* capital sentencing factfinding and the ultimate sentencing decision to the trial judge alone. Florida's system is different. As distinguished from Arizona's system, Florida has a hybrid system in which the jury renders an advisory verdict on the sentence, and the trial judge decides the ultimate sentence. *See* Fla. Stat. § 921.141; *Ring, supra,* 536 U. S. at 608, n. 6. As noted, *Ring* holds that any fact which increases the penalty beyond the statutory maximum must be found by the jury. In Florida, death is the statutory maximum for first-degree murder if sufficient statutory aggravating circumstances are found to outweigh any existing mitigating circumstances as determined in separate**

sentencing proceedings outlined in §921.141.  Where the jury renders an advisory sentence recommending death, it has necessarily made the factual determination that the aggravating circumstances outweigh any mitigating ones; thus, Florida's system does not run afoul of *Ring*'s prohibition that any fact necessary to exceed the maximum penalty be found by a jury.[27]

Other factors satisfy the court that the Sixth Amendment has not been violated in this case.  First, in Petitioner's sentencing proceeding the jury returned an advisory sentence recommending death by a unanimous vote which of course means that every juror in Petitioner's case decided that death was the appropriate sentence even though unanimity is not required by Florida's statute.  Second,  Petitioner had multiple prior felony convictions (*i.e.*, unarmed robbery; kidnapping and robbery; armed burglary and aggravated battery; and armed burglary and armed theft), which automatically established the prior violent felony statutory aggravating circumstance.[28]  *Ring*'s predecessor, *Apprendi*, expressly exempted prior convictions from its jury finding and proof requirements, and nothing in *Ring* altered that.  *See Apprendi*, 530 U.S. at 2362-63 ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."); *Ring*, 536 U. S. at 597, n. 4.

Regarding Petitioner's argument that the Sixth Amendment requires the jury to make findings related to the weighing of aggravating and mitigating circumstances beyond a reasonable doubt, *i.e.*, whether sufficient aggravating circumstances exist to justify the imposition of the death penalty beyond a reasonable doubt, Petitioner

---

[27] Prior to its decision in *Ring*, the Supreme Court upheld the constitutionality of Florida's statutory capital sentencing scheme, including its jury-override feature which allows the trial judge to override a jury's advisory sentence of life and to impose the death sentence under certain circumstances. *See Spaziano v. Florida*, 468 U.S. 447, 104 S. Ct. 3154, 82 L. Ed.2d 340 (1984) The Supreme Court has not addressed the jury override feature of Fla. Stat. § 921.141(3) in light of *Ring* nor has Petitioner argued that this provision is unconstitutional. The court notes, however, that the override feature is difficult to square with *Ring*.

[28] *See Grim I,* 841 So.2d at 459.

failed to exhaust this claim in state court and thus the claim is procedurally defaulted for purposes of habeas review. *See* Ground VII, subsection 2. Nonetheless, even if this claim had been properly exhausted, there is no Supreme Court case establishing this as a requirement. To the contrary, the Court's reasoning in *Kansas v. Marsh*, 548 U.S. 163, 126 S. Ct. 2516, 165 L. Ed. 2d 429 (2006), supports a conclusion that the Sixth Amendment does not require a death penalty jury to be instructed that it must find that the aggravating factors outweigh the mitigating factors beyond a reasonable doubt. In *Marsh*, the Court held that the Kansas capital sentencing system, which at that time directed imposition of the death penalty when a jury found that aggravating and mitigating circumstances were in equipoise, was constitutional. The Court stated:

> Accordingly, the reasoning of *Walton* [*v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990)] requires approval of the Kansas death penalty statute. At bottom, in *Walton*, the Court held that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances. *A fortiori,* Kansas' death penalty statute, consistent with the Constitution, may direct imposition of the death penalty when the State has proved beyond a reasonable doubt that mitigators do not outweigh aggravators, including where the aggravating circumstances and mitigating circumstances are in equipoise.

*Id.*, 548 U.S. at 173. Additionally, in a concurring opinion in *Marsh*, Justice Scalia recognized that the Constitution does not require a reasonable doubt standard as to the weighing process: "[T]he State could, as Marsh freely admits, [adopt a] scheme requiring the State to prove by a mere preponderance of the evidence that the aggravators outweigh the mitigators." *Id.* at 186 n. 2. No member of the *Marsh* Court disagreed.

Finally, with regard to Petitioner's argument that his death sentence is invalid because his indictment did not reference the aggravating factors required for a death sentence, the Florida Supreme Court held as follows:

> Grim argues that the State violated his constitutional rights under the Sixth Amendment of the United States Constitution and article I, section

15 of the Florida Constitution by failing to specify in the indictment which aggravating circumstances it would rely on in seeking the death penalty. We rejected a similar argument in *Winkles v. State*, 894 So.2d 842 (Fla.2005):

> As we have said before, "[t]he aggravating factors to be considered in determining the propriety of a death sentence are limited to those set out in [the statute]. Therefore, there is no reason to require the State to notify defendants of the aggravating factors that it intends to prove."

*Id.* at 846 (quoting *Vining v. State*, 637 So.2d 921, 927 (Fla.1994)). Grim's claim is likewise without merit.

*Grim II*, 971 So.2d at 103.

Petitioner advances the argument that the holding in *Ring* and the jury trial guarantees of the Sixth Amendment require that the essential elements of the aggravated crime of capital murder alleged by the state be charged in his indictment as elements of the offense, relying on those decisions of the circuit courts of appeals wherein *Ring* has been applied to federal capital murder indictments.[29]   The Supreme

---

[29]   Several circuit courts have concluded that *Ring's* analysis that the jury must find at least one aggravating factor beyond a reasonable doubt before the death penalty can be imposed, applies with equal force in the context of a Fifth Amendment challenge to the lack of statutory aggravating factors in an indictment charging a death-eligible crime under the Federal Death Penalty Act, 18 U.S.C. §§ 3591-98 ("FDPA"). The Indictment Clause of the Fifth Amendment provides, in pertinent part, that "[n]o person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury." U.S. Const. amend V.  The Supreme Court in *Jones v. United States*, 526 U.S. 227, 232, 119 S. Ct. 1215, 1219, 143 L. Ed.2d 311 (1999), a prosecution brought under the federal carjacking statute, 18 U.S.C. § 2119, noted "[m]uch turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." The Court held that,
> under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt.

*Id.* at 243 n.6. As a result, in federal prosecutions, certain "sentencing factors" may function as the equivalent of elements of the crime, entitling a defendant to have them charged in an indictment and submitted to a jury under the standard of beyond a reasonable doubt. Accordingly, several circuit courts have concluded that under the FDPA, the Fifth Amendment requires that at least one statutory aggravating factor supporting imposition of the death penalty be presented to a grand jury and charged in the indictment. *See United States v. Allen*, 406 F.3d 940, 942-43 (8th Cir. 2005) (en banc)("*Ring* did not address whether the Fifth Amendment also requires capital aggravating factors to be found by the grand jury and included in the indictment. Nonetheless, we think that *Ring* necessarily implies such a Fifth Amendment requirement."); *United States*

Court has not addressed the implications of its decision in *Ring* in the context of a habeas petitioner's assertion of his Fifth Amendment right to indictment by a grand jury in state court prosecutions. The Supreme Court expressly noted both in *Apprendi* and in *Ring* that the issue of whether the Fifth Amendment right to indictment by a grand jury applied to the states through the Fourteenth Amendment was not before it. *See Apprendi,* 530 U.S. at 477 n.3 ("[The Fourteenth] Amendment has not, however, been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury' that was implicated in our recent decision in *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998). We thus do not address the indictment question separately today."); *Ring*, 536 U.S. at 597 n.4 (citing *Apprendi, supra*)("Finally, Ring does not contend that his indictment was constitutionally defective.").

Because there is no Supreme Court case extending the jury trial guarantees of the Sixth Amendment to require that aggravating factors must be alleged in a state

---

*v. Robinson*, 367 F.3d 278, 284 (5th Cir. 2004)("*Ring's* Sixth Amendment holding applies with equal force in the context of a Fifth Amendment Indictment Clause challenge, even though the Supreme Court has yet to hold as much in a capital case."); *United States v. Higgs*, 353 F.3d 281, 297-98 (4th Cir. 2003)("Higgs asserts that the principles of *Apprendi* and *Ring* dictate that any factor required to be submitted to the jury must be included in the indictment. We agree."). In *United States v. Brown*, 441 F.3d 1330, 1367 (11th Cir. 2006), the court recognized and held:

> Although *Ring* was a Sixth Amendment case, other circuits have unanimously found that the holding applies with equal force in the context of a Fifth Amendment challenge to the lack of statutory aggravating factors in an indictment charging a death-eligible crime under the FDPA. . . . We agree with our sister circuits that at least one statutory aggravating factor, which is necessary to elevate the maximum sentence from life imprisonment to death, must be charged in the indictment.

(citations omitted). To date, the Supreme Court has not applied the Fifth Amendment's guarantee to indictment by a grand jury to state prosecutions. *See Alexander v. Louisiana*, 405 U.S. 625, 633, 92 S. Ct. 1221, 1226-27, 31 L. Ed.2d 536 (1972)("the Due Process Clause . . . does not require the States to observe the Fifth Amendment's provision for presentment or indictment by a grand jury."); *see also Hodgson v. Vermont*, 168 U.S. 262, 272, 18 S. Ct. 80, 83, 42 L. Ed. 461, 464 (1897) ("[T]he words 'due process of law,' in the fourteenth amendment of the constitution of the United States, do not necessarily require an indictment by a grand jury in a prosecution by a state for murder."); *Hurtado v. California*, 110 U.S. 516, 538, 4 S. Ct. 111, 122, 28 L. Ed. 232, 239 (1884) (same). S*ee also Allen*, 406 F.3d at 942 ("*Ring* did not address the indictment issue because it involved a state prosecution, and the Fifth Amendment's grand jury requirement has not been construed to apply to the states."); *Fields v. Soloff*, 920 F.2d 1114, 1118 (2d Cir.1990) (Fifth Amendment right to indictment by a grand jury is not incorporated by the Due Process Clause of the Fourteenth Amendment and does not apply to the states).

capital murder indictment nor is there a case applying the Fifth Amendment Indictment Clause to the states, the Florida Supreme Court's rejection of this claim is not contrary to or an unreasonable application of clearly established federal law. *See Washington v. Crosby*, 324 F.3d 1263, 1265 (11th Cir. 2003)(quoting *McIntyre v. Williams*, 216 F.3d 1254, 1258 (11th Cir.2000) ("In applying the 'contrary to' prong of AEDPA, we have recognized that where no Supreme Court precedent is on point, 'we cannot say that the state court's conclusion ... is contrary to clearly established Federal law as determined by the U.S. Supreme Court.'"); *Isaacs v. Head*, 300 F.3d 1232, 1252 (11th Cir. 2002) (holding that the Georgia Supreme Court's decision was not contrary to clearly established federal law because neither the petitioner nor the federal court found any Supreme Court precedent to support the petitioner's assertion); *Putman v. Head*, 268 F.3d 1223, 1241 (11th Cir. 2001)("Clearly established federal law is not the case law of the lower federal courts, including this Court. Instead, in the habeas context, clearly established federal law 'refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state court decision.'" (quoting *Williams v. Taylor*, 529 U.S. 362, 412, 120 S. Ct.1495, 1523, 146 L. Ed.2d 389 (2000)). Thus, Petitioner has failed to demonstrate that Florida's death penalty sentencing scheme is unconstitutional for the reasons he has alleged. Petitioner has failed to demonstrate that in rejecting this claim the state court relied on erroneous facts, or applied law contrary to that established by the United States Supreme Court or in an objectively unreasonable manner in light of such precedent. Given these considerations, this court cannot conclude that the Florida Supreme Court unreasonably applied, or reached a decision contrary to, clearly established federal law. Therefore, Petitioner is not entitled to habeas relief on this ground.

## V. CERTIFICATE OF APPEALABILITY

As amended effective December 1, 2009, § 2254 Rule 11(a) provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the

specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."
A timely notice of appeal must still be filed, even if the court issues a certificate of
appealability.  § 2254 11(b).

The court concludes that the following issue raised in Ground IX is debatable
among jurists of reason and finds that the issue is adequate to deserve encouragement
to proceed further:  whether the jury trial guarantees of the Sixth Amendment and/or
the Indictment Clause of the Fifth Amendment require that capital aggravating factors
be found by the grand jury and charged in the indictment in a state capital prosecution.
 See Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 1603-04, 146 L. Ed. 2d 542
(2000) (explaining how to satisfy this showing).  See also Williams v. Taylor, supra, 529
U. S at 407.  Therefore, Petitioner should be granted leave to appeal on this issue.

## VI. CONCLUSION

For the foregoing reasons, the petition for issuance of a writ of habeas corpus
(doc. 1) is DENIED.  Petitioner may appeal and a certificate of appealability is issued
for appeal on the issue of whether the jury trial guarantees of the Sixth Amendment
and/or the Indictment Clause of the Fifth Amendment, applicable to the states through
the Fourteenth Amendment, require(s) that capital aggravating factors must be found
by the grand jury and charged in the indictment in a state capital prosecution.

DONE and ORDERED this 31st day of March, 2011.


s/ *M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**